THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD TELLEZ, Defendant-Appellant.

First District (6th Division) No. 1—90—0129

Opinion filed September 25, 1992.—Rehearing denied December 10, 1992.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

Following a jury trial, the defendant, Ronald Tellez, was convicted of the murder of Archer Mueller and sentenced to a term of natural life imprisonment. The defendant contends that evidence of other crimes and evidence that he possessed numerous weapons were improperly admitted and that the trial judge erred in barring him from fully exploring the nature of the plea agreement entered into by the State's crucial prosecution witness. No issue is made of the sufficiency of the evidence.

Archer Mueller, who owned a vending machine business at 12255 South Western Avenue in Blue Island, Illinois, suffered three gunshots on the night of March 28, 1986, and died sometime between 9:30 p.m. and 2:10 a.m. of the following day. The defendant, a Blue Island police officer, was arrested approximately 16 months later in July 1987 and was subsequently indicted for murder, theft, armed violence and solicitation to commit murder. He was tried only for murder.

Before trial, the defendant filed a motion *in limine* which sought to preclude the admission of evidence that the defendant had committed the murder of Harold Rowley in South Bend, Indiana, in 1984. The defendant also moved to exclude evidence that he had possessed

numerous weapons at the time of his arrest. The trial judge denied the motions.

Mueller's employees called him at his office by telephone and spoke to him at 9:30 p.m. on March 28, 1986. When they called again at around 10:15 p.m., no one answered. Arnold Mueller, Archer's twin brother and business partner, was called by an employee who unsuccessfully tried to get into the company office. Arnold arrived at the office at 2:10 a.m. He noticed that all of the lights were on. He discovered that the outer glass door was open, but the inner door, which was operated by a buzzer, was locked. He used his key to open the inner door to the office and noticed that the door to the cashier's office, which should have been locked, was open. He observed the victim's keys hanging in the door lock.

The walk-in vault should have been open, but it was closed and locked. He operated the combination lock to open the vault door and discovered his brother lying facedown on the floor of the vault. He subsequently noticed that the file-cabinet drawers in the cashier's office were open, and the rent-receipt envelope was empty. The envelope was kept in a safe in the cashier's office and had contained at least $335 in cash.

Arnold believed that the only people who had a key to the inner door were himself, his brother, and Joe Winsler, another employee. He later discovered, however, that his brother had been secretly married to Connie Branco and that she also had a key to the inner door.

Tom Doornkaat, a Blue Island police officer, testified that he arrived at the scene at 2:30 a.m. and found no sign of forced entry into the office. He was acquainted with the defendant, who was also a Blue Island police officer. According to Doornkaat, the defendant's service weapon prior to the time of the murder was a Ruger .357 magnum, but after the night of the murder, the defendant carried a Smith and Wesson 66.

Hayden Baldwin, an evidence technician for the Illinois State Police, testified that he arrived at the scene at 3:30 a.m. and found no signs of forced entry. Based upon the coagulation of the victim's blood, he determined that the death had occurred four to six hours earlier. The victim had sustained two gunshots in the back and one shot in the head. He found a key to the inner door on the floor near the victim.

James Collier, an Illinois State policeman, testified that he assisted the Blue Island police in the investigation. In July 1986, he received information from the United States Secret Service that John Branco had information about the Mueller murder. Branco was a Fed-

eral prisoner in California. Collier went to the Federal prison in California to interview Branco. Thereafter, Collier worked with the FBI and with the Federal Bureau of Prisons to obtain a furlough for Branco, who had agreed to assist in the investigation of the Mueller murder. In April 1987, Collier secured a furlough for Branco and obtained court approval to record Branco's conversation with the defendant and with other suspects in the murder. Branco was flown to Chicago and taken to the Holiday Inn in Alsip, Illinois. On April 27, 1986, Branco was fitted with a recording device by Special Agent William O'Donnell of the Illinois State Police.

John Branco testified he was the father of Connie Branco, who was the victim's wife at the time of the murder. He was on parole after serving concurrent prison terms of 15 years for counterfeiting and three years for fraud. He acknowledged that he had been friends with members of organized crime. His daughter visited him in the California prison in June 1986 and told him that she had been involved in Archer Mueller's murder. Branco told her that he was concerned for her safety. He then contacted the United States Secret Service, repeated his conversation with his daughter about the murder, and later agreed to cooperate with the FBI in the investigation. In April 1987, Branco flew to Chicago in the custody of the FBI. On April 27, 1987, Branco was fitted with a recording device, and at approximately 3:30 p.m., he met the defendant at a lounge in Alsip. His conversation with the defendant lasted for 20 to 30 minutes and was recorded by the device he secretly wore. The recording of that conversation was admitted into evidence and was played for the jury. The prosecution also provided each member of the jury with a transcript of the recorded conversation.

During the recorded conversation, the defendant said that he had wanted to meet Branco for some time. He also told Branco that he had been qualified on 14 different weapons and had been a member of the United States Army Special Forces in Panama, where he conducted 33 operations. The defendant admitted that he "took out" Archer Mueller. He said that he had to go through two closed doors and had to wait for someone to leave before he could kill Mueller. He wore a ski mask, and put two or three shots exactly where he wanted them, making sure the job was done. He was the second Blue Island police officer on the scene following the discovery of Mueller's murder.

He also told Branco that he had "hit" a man who owned Corby's restaurant in South Bend, Indiana. He described the manner in which he "assassinated" Mueller. He said that he would kill in "the blink of

an eye" if ordered to do so, and he did not need a reason to kill someone and did not kill for personal reasons. He worked alone during his "hits" but used an outsider if necessary to conduct collateral tasks, such as driving a car. He also told Branco that he had all of the weapons he needed secreted in a certain location.

When they left the lounge, Branco introduced the defendant to John Bonino, an undercover FBI agent, who was posing as a member of the Mafia and was waiting in a car which was parked outside the lounge.

John Bonino testified that he subsequently met the defendant on May 14, 1987, at a tollway oasis in Hinsdale, Illinois. Bonino wore a hidden recording device and taped his conversation with the defendant. The prosecution played the tape of this conversation for the jury and also provided each member of the jury with a transcript of the taped conversation.

During that conversation, the defendant told Bonino that he understood he would be working as a "hit man" for organized crime in Chicago. The defendant also said that he shot Mueller three times in the side and took an envelope of checks and some money to give the impression that Mueller had been shot during a robbery. Connie Branco had "set the whole thing up." Connie Branco gave him a key to open one of the doors in Mueller's office, and he used an object to open the second door. He agreed to kill Mueller so that he could meet John Branco.

On May 21, 1987, Bonino again met with the defendant at the tollway oasis and again recorded their conversation. This conversation primarily concerned future work for organized crime and included a brief discussion about the murder of Harold Rowley in South Bend, Indiana. At the end of the conversation, Bonino gave the defendant $250.

Connie Branco testified she was the wife of the victim and had been charged with murder and solicitation to commit murder in connection with his death. At the time of trial, she was incarcerated in the county jail. She had entered into a plea agreement with the State. Under the terms of that agreement, she agreed to plead guilty to the charge of solicitation to commit murder and promised to testify truthfully in the murder trial of the defendant. In exchange, the State agreed to drop the murder charge and to recommend a 10-year sentence for the conviction of solicitation to commit murder.

Connie Branco married Archer Mueller in November 1984. She worked in the office of the business owned by Mueller and his brother. She also owned a restaurant. She had a set of keys to the business

office. Mueller was a heavy drinker, and they had violent fights. She and Mueller separated in 1985, and she filed for divorce. She continued to work at the office after her separation from Mueller. She had known the defendant since 1979 and had dated him at one time. The defendant frequently visited her at the business office.

Once in January 1986, she met Mueller at his office. He was upset because a sheriff had tried unsuccessfully to serve him with a complaint for divorce. Mueller told her at that time that he would never give her a divorce. They argued, and Mueller hit her. She ran out of the office and drove to her restaurant. The defendant came into the restaurant, and she told him about her fight with Mueller.

The defendant said that she should get rid of Mueller and offered to do it for her. He also said that it would not cost her anything if she could arrange for him to meet her father so the defendant could prove to him he could "kill like the Mafia does." The defendant had wanted to meet her father for several years. The defendant told Connie that he would need help from someone and that she would have to pay that person $3,000 for expenses.

Over the next few months she met with the defendant several times, and on three occasions she gave him money totalling $3,000. She also gave him the key to the inner office door and supplied him with information about Mueller. He told her that he would "hit" Mueller sometime at the end of March 1986, while she was on a cruise with her children and with her previous husband, Joe Henke. She was not to contact him when she returned from the cruise because of the investigation that would follow the murder.

She went on a cruise in March 1986 with her two children and with her former husband, Joe Henke. Mueller, who paid for the trip, was killed while she was gone. She was aware that under the terms of Mueller's will, she and her children were to receive 60% of his considerable estate. The defendant visited her in June 1986 at her restaurant and told her that he had killed Mueller. He said that he had committed the crime in a manner which made it appear to be a Mafia "hit." He asked her for money to get a car so he could get out of town because he had just robbed someone. He also asked again to meet her father.

After this testimony, the defendant moved for a mistrial, claiming that the State had improperly introduced evidence of another crime. The trial judge struck Branco's testimony referring to the defendant's commission of a robbery and admonished the jury to disregard it.

Branco testified further that she visited her father in the California prison in June 1986. She stated that when her father came to Chi-

cago in April 1987, she had a conversation with him and an FBI agent. At that time, her father asked her to set up a meeting with the defendant, and she did so. At the defendant's request, she also set up a meeting for the defendant with Bonino, whom she later learned was an FBI agent.

She was arrested in July 1987 and charged with murder and with solicitation to commit murder. She reached an agreement to cooperate with the State in March 1988. On cross-examination, she testified that she was unaware that her conversations with her father and with Bonino about her arrangement to have Mueller killed had been recorded.

Dr. Robert Stein, chief medical examiner for Cook County, performed the autopsy on the victim on March 29, 1986. Stein testified that the victim died of multiple gunshot wounds, one in the head and two in the back.

Michael Henehan, a Blue Island police officer, testified that he had known the defendant since 1980, and that the defendant's closest friend was James Gentile, an attorney who had an office in Blue Island. Gentile stored guns and ammunition in the second-floor apartment of the building he owned in Blue Island. Henehan identified eight different guns which had been stored in a safe in Gentile's apartment. Henehan stated that he had been friends with the defendant and Gentile, and the defendant had access to the guns and ammunition which were kept in Gentile's apartment. The defendant used a Ruger .357 during his first five or six years on the Blue Island police force. The defendant began to carry a different service weapon in April or May of 1986. When he was arrested in July 1987, the defendant was carrying a .380 caliber Llama semiautomatic as a back-up weapon.

Donald Riedman, a firearms identification expert, testified that the bullets recovered from the victim's body were .38 or .357 magnum caliber and nylon-coated.

Earnest Peele, an evidence technician, testified that when he compared the bullets recovered from the victim's body with some of those stored in Gentile's apartment, he found that the two sets of bullets shared similar characteristics and composition.

David Schultz, a Blue Island police officer and range instructor, testified that the defendant originally used a Ruger .357 as his service weapon, but shortly after March 1986, he switched to a Smith & Wesson model 66.

Gregory Jefferson testified that he had known the defendant for four or five years. From June 1986 to December 1987, Jefferson

worked at the restaurant owned by Connie Branco. During this time, Jefferson frequently saw the defendant at the restaurant. The defendant asked Jefferson to watch Connie and to listen in on her telephone conversations. Jefferson remained in contact with the defendant and with the defendant's girlfriend, Laura Steele, after the defendant was arrested in July 1987. After his arrest, the defendant directed Jefferson to fill in blanks in a post-dated diary kept by the defendant alleged to be a record of his investigation of the Mueller murder. The defendant's girlfriend paid Jefferson to make these post-dated diary entries. The defendant offered to pay Jefferson to memorize the diary entries and to testify falsely on the defendant's behalf. Jefferson, however, turned everything over to the police.

Joseph Baskys, a Blue Island police officer, testified that on March 28, 1986, the defendant worked from 10:31 p.m. to 7:24 a.m. The defendant lived within one mile of the victim's office and less than one mile from the police station, and he could drive those distances in a few minutes.

Willie Davis, an Illinois State police officer, testified that he searched the home of the defendant and Laura Steele on July 15, 1987. Davis stated that he recovered numerous weapons, as well as ammunition and different kinds of make-up from the basement of the defendant's home.

The defendant moved to exclude the testimony of Laura Steele regarding her activities with the defendant in South Bend in 1984. The State opposed the defendant's motion, arguing that the testimony would corroborate the admissions made by the defendant during his tape-recorded conversations with John Branco. The trial court denied the motion.

Laura Steele testified that she lived with the defendant from October 1984 to July 1987. She denied that she owned the make-up cream, recovered by the police during the search of the defendant's home. She remained in contact with the defendant after his arrest and visited him while he was in jail, but she denied that the defendant ever told her he was working on a secret investigation of the Mueller homicide. While the defendant was in jail, she carried a letter from the defendant to Jefferson. The defendant also directed her to deliver to Jefferson a copy of the defendant's diary as well as several hundred dollars which she had obtained from Gentile.

On July 22, 1984, she and the defendant drove to South Bend, Indiana, and stayed at the Holiday Inn where the defendant registered as Paul Gomez. While in South Bend, they drove past Corby's restaurant. The defendant told Steele the restaurant was owned by a man

named Rowley and that the defendant was to see Rowley that night. The couple then drove past Rowley's house. That evening, the defendant left the motel to attend his meeting with Rowley. Before he left, the defendant told her that, if he did not return, she was to take a bus home and tell no one about the trip. The defendant subsequently returned to the motel, and he and Steele drove back to Chicago the following day.

Rodney Beck testified that he went to high school with the defendant. The defendant sent him a letter in the early part of 1989 asking him to get someone he trusted to state that he had seen a brown, two-door car occupied by three men parked in the rear wash section of the Tower Car Wash at 123rd Street and Western Avenue at approximately 9:30 p.m. on March 28, 1986. (The victim was killed at 12255 South Western.) The defendant further requested that the person describe the driver of the brown car as a Mexican with long black hair, long side-burns, and wearing a blue T-shirt. The front passenger was to be described as little and old, with gray or light brown hair. The rear passenger was to be described as Mexican and having long hair. The defendant offered to pay several hundred dollars for this statement. The defendant's letter also requested that Beck have Jefferson point out Dan Peters, who was not further identified, so that Peters would be blamed for Mueller's murder. Beck refused to comply with any of the defendant's requests, and he turned the evidence over to the police.

The parties stipulated that the defendant was a friend of Gary Kessen, who was the stepson of Harold Rowley.

James Eichorst testified that during July 1984, he was the manager of Corby's tavern and restaurant, which was owned by Harold Rowley. On July 31, 1984, he was at the restaurant with Rowley. At approximately 7 p.m., Eichorst left Rowley at the restaurant and went to Rowley's home. As he walked in the front door of Rowley's home, he felt a gun at the back of his head, and was told not to move or he would be killed. A pillow case was then placed over his head, and he was tied up and placed in a bedroom where he remained for four hours. During this time, Eichorst heard two different voices. When Rowley arrived home at approximately 11 p.m., Eichorst heard three shots. Eichorst later learned that Rowley had been shot and killed.

According to Eichorst, Rowley always kept a .380 Llama weapon in a specific place in his home prior to the shooting. The weapon was not found in Rowley's home after his death. Eichorst identified the .380 Llama that had belonged to Rowley. At the time of his murder,

Rowley was in the midst of a divorce from his wife, Rose Kessen, the mother of the defendant's friend, Gary Kessen.

Martin Gersey, a South Bend police officer, testified that during his investigation of Rowley's murder, a .380 Llama handgun was found to be missing. He identified the Llama gun box which was found in Rowley's home and which bore the serial number 806313. The gun box was empty when the officers searched Rowley's home.

Douglas Hoglund, a Blue Island police officer, identified the .380 Llama handgun which bore the serial number 806313. Hoglund testified that he recovered the gun during a search of the defendant's car at the time of his arrest. In addition, Hoglund recovered two pairs of latex gloves from the defendant's car.

The defendant testified that he became a Blue Island police officer on March 1, 1979. He stated that he knew Gary Kessen, but had never met Kessen's stepfather, Harold Rowley. He acknowledged that he went to South Bend in July 1984 with Laura Steele and registered at a hotel under the name of Paul Gomez. He and Steele drove by Rowley's home to see if Kessen's car was parked outside. The defendant later went drinking and left Steele at the hotel because she was not old enough to drink with him. He never found Kessen and ultimately returned to the hotel. He denied that he returned to South Bend and killed Harold Rowley on July 31, 1984.

He met Connie Branco in 1980, and they became friends shortly thereafter. During the week before Mueller's death, he purchased a Smith & Wesson 66 for himself and sold his Ruger to Connie Branco. He sold the Ruger to Connie because she indicated that she needed a weapon to protect her business. He denied that he ever had any nylon-covered bullets in his home.

The defendant testified that his involvement in the Mueller murder was based upon an undercover investigation which he initiated because he wanted to solve the case. His desire to solve the case was based upon his belief that if he was successful, he would be promoted to the rank of detective. His meetings and conversations with Connie Branco, with her father, and with John Bonino were all a part of his private scheme to find Mueller's killer. He had served in the military, but he was never assigned to the Special Forces in South America and did not perform a single operation there.

He identified the diary which chronicled his undercover investigation of the Mueller homicide. He admitted that he wrote the diary while in jail and well after the time that he had conducted the investigation. He also admitted that he had asked Gregory Jefferson to keep

him informed of Connie's activities, to make post-dated entries in the diary, and to testify falsely on his behalf.

The defendant testified that he told Connie that he wanted to work for organized crime in order to gain her trust and confidence. At Connie's direction, the defendant lied to Branco about his involvement in Mueller's murder. Connie said that her father would trust the defendant if he took responsibility for the Mueller homicide. He also lied to Branco about his involvement in the Rowley homicide and about several other things in his background.

He testified that he did not shoot or kill either Rowley or Mueller. His confessions to both murders were false and were only a part of his undercover investigation. He admitted, however, that while he was in jail he told William Coleman, a fellow inmate, that he killed Mueller. He did so only because he needed to portray a certain image in jail.

On March 28, 1986, the defendant worked two shifts. The first shift began at 6:30 a.m. and concluded at 3:30 p.m. The second shift began at 10:30 p.m. and concluded at 7:30 a.m. on March 29, 1986. He went home between shifts to sleep, shave, and shower. The .380 Llama which was recovered from his car was given to him by Rowley's stepson, Gary Kessen.

Gary Williams, a military technician for the United States Army, testified that the defendant was never in the Special Forces, but served as a unit clerk in Fort Ord, California, and was responsible for paperwork.

Floyd Turner, an investigator with the Cook County public defender, testified that on May 11, 1989, he interviewed Gregory Jefferson. According to Turner, Jefferson told him that, although the diary entries were made a year after the events actually occurred, the substance of the entries in the defendant's diary was true. Jefferson also told Turner that the defendant asked Jefferson to watch Connie because the defendant suspected she was responsible for Mueller's death and because the defendant was afraid for his life while he was in jail.

The parties stipulated that the defendant's fingerprints were not found on the envelope or checks taken from Mueller's office.

Jess Hamblen, a sales representative for the Federal Cartridge Corporation, testified for the defendant that millions of rounds of nylon-coated ammunition were manufactured per year, and that consumers were able to buy this ammunition just like any other type of ammunition.

In rebuttal, the State recalled Connie Branco, who testified that she did not buy a Ruger handgun from the defendant.

Miles Cooperman, deputy chief and internal investigator for the Cook County Department of Corrections, testified that police officers are given additional protection while in jail, and the defendant made no complaint of intimidation or physical abuse by inmates or by officers.

At the sentencing hearing, the State requested that the defendant receive the death penalty under the contract murder provision of the sentencing statute. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(5).) The jury determined, however, that the defendant should not be sentenced to death. Thereafter, the trial judge imposed a prison term of natural life.

The defendant initially contends that he was deprived of his right to a fair trial because the prosecution was permitted to introduce evidence that the defendant had committed other crimes. Specifically, the defendant asserts that he suffered prejudice by the State's introduction of evidence that he had committed the murder of Harold Rowley in 1984. The defendant also contends that he was prejudiced by the introduction of evidence that he possessed numerous weapons at the time of his arrest.

Evidence of other crimes may be admitted if relevant to establish any fact material to the prosecution other than the propensity of the defendant to commit a crime. (*People v. Illgen* (1991), 145 Ill. 2d 353, 583 N.E.2d 515; *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) When such evidence is offered, the trial judge must weigh its probative value against its prejudicial effect and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365; *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.

Evidence is considered relevant if it has the tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. (*Illgen*, 145 Ill. 2d at 365-66; *Stewart*, 105 Ill. 2d at 54.) Evidence of the commission of other crimes may be relevant to establish the accuracy and validity of a confession which the defendant has asserted was untrue or coerced. See *People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949.

■■ Based upon the arguments of defense counsel in presenting the motion *in limine*, the trial judge was aware that the defendant intended to deny any involvement in Mueller's death. Counsel also advised the judge that the defendant intended to testify that his confessions of guilt to the murders of both Mueller and Rowley were false and part of a private undercover investigation. In ruling on the mo-

tion *in limine*, the judge noted that the prosecution should be permitted to introduce evidence which would substantiate and corroborate the defendant's confession to the murder of Mueller.

The defendant testified on his own behalf and did state that he was not guilty of killing either Mueller or Rowley. He also testified that he confessed to both crimes in an attempt to make his undercover role more convincing and that he had fabricated those confessions.

The decision of the trial court regarding the admissibility of evidence of other crimes will not be disturbed on review unless it constitutes a clear abuse of discretion. (*Illgen*, 145 Ill. 2d at 364; *People v. Franklin* (1990), 135 Ill. 2d 78, 552 N.E.2d 743.) We find that the trial judge did not abuse her discretion in admitting evidence of the defendant's involvement in Rowley's killing, because that evidence refuted the claim that his confessions to the murders of both Mueller and Rowley were false and were fabricated to support his role in the undercover investigation. See *King*, 109 Ill. 2d at 530-31.

■ We also find that the defendant was not prejudiced by the admission of evidence that he possessed numerous weapons at the time of his arrest. As the defendant now argues, there is nothing incriminating about a police officer owning several weapons. This evidence also corroborated the defendant's recorded conversation in which he said that he had access to numerous weapons.

■ The defendant maintains that, assuming the admissibility of the Rowley homicide, the State erred by introducing excessive details of that offense. At the hearing on the motion *in limine*, the State argued that it should be permitted to show that the defendant had confessed to John Branco, not only the Rowley killing, but another murder in Franklin Park around September or October 1985. The defendant argued that the evidence of both crimes was not admissible at all unless the State could show beyond mere suspicion that the defendant had committed those crimes. In response, the State proffered the evidence it would introduce to prove that the defendant had, in fact, killed Rowley and it also proffered some proof corroborating the confession of the Franklin Park murder. The judge ruled that the proffered testimony of the Rowley killing satisfied the preliminary requirements but that the proffered proof of the Franklin Park killing did not. Consequently, the State was required to introduce what would be considered detailed evidence of the Rowley killing. We find it very significant that it was the trial judge, *sua sponte*, who cautioned against the introduction of excessive detail. She invited the defendant's attorney to voice an objection at any time that he felt the

State was proving too much concerning the Rowley crime. The defendant's attorney made no such objection. Even if we could say that the State did prove too much, considering the overwhelming nature of the properly admitted evidence, we do not believe the admission of those details affected the verdict. See *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.

■ In addition, we do not believe that the defendant was prejudiced by Connie Branco's statement that the defendant had been involved in a robbery. Defense counsel objected to the admission of this testimony and moved for a mistrial on the ground that the prosecution had introduced evidence of the defendant's involvement in another crime. The trial court denied the defendant's motion for a mistrial, but struck Branco's reference to the defendant's commission of a robbery and instructed the jury to disregard that evidence. Generally, the trial court can correct an error by sustaining a timely objection and by instructing the jury to disregard the comment. (*Franklin*, 135 Ill. 2d at 100.) We recognize that that rule is subject to exception. However, we again hold that the evidence of a robbery did not affect the verdict, considering the overwhelming nature of the State's proof.

We next consider the defendant's claim that he was improperly precluded from fully exploring the nature of the plea agreement of Connie Branco. He maintains that he was deprived of his right to a fair trial because the trial judge prevented him from cross-examining Connie Branco. The defendant's cross-examination would have explored the fact that she had received credit against her sentence for the two years and several months that she had already served before testifying and could serve as little as five years because she would receive day-for-day good conduct credit while in prison. The trial judge ruled that this evidence was inadmissible because it was too speculative.

The defendant also contends that the trial judge erred in excluding the testimony of Moses Collins, a supervisor in the public defender's office, who would have stated that the crime of solicitation to commit murder was a Class X felony which carried a maximum sentence of 60 years' imprisonment. In making this evidentiary ruling, the trial judge stated that although the State could recommend a sentence of 10 years for Branco, the court was not obligated to follow that recommendation. Thus, the sentence which would ultimately be imposed upon Connie Branco was speculative.

The scope of cross-examination is generally within the trial court's discretion, and the widest latitude should be allowed the defendant in cross-examination for the purpose of establishing interest, bias, or mo-

tive to lie. (*People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708.) The evidence of interest, bias, or motive to lie must not be remote or uncertain because the evidence must potentially give rise to the inference that the witness has something to gain or lose by his testimony. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475-76, 485 N.E.2d 9; *People v. Sanders* (1986), 143 Ill. App. 3d 402, 407, 493 N.E.2d 1.) A court of review is limited to a determination of whether the trial court abused its discretion and whether the defendant was prejudiced as a result. *Sanders*, 143 Ill. App. 3d at 407.

■ In this case, defense counsel was permitted to cross-examine Connie Branco about her involvement in the murder of Mueller and about the plea agreement she had entered into with the State. She knew she could receive the death penalty or a sentence of natural life without parole if convicted on the murder charge. She acknowledged that she had entered into a plea arrangement with the State and that under the terms of that arrangement, she agreed to plead guilty to the charge of solicitation to commit murder and promised to testify truthfully in the murder trial of the defendant. In exchange, the State agreed to drop the murder charge and to recommend a 10-year sentence for her conviction for solicitation to commit murder. Thus, the record reflects that the jury was fully aware of the charges which had been brought against Branco and was also aware of the nature and terms of her plea agreement.

As a general rule, the widest possible latitude should be given the defendant on cross-examination of an accomplice. Although we do not agree that the proof the defendant sought to establish was inadmissible, we find that the defendant sufficiently established the interest of Connie Branco in testifying for the State and that the defendant was not prejudiced by the exclusion of this evidence. Consequently, we hold that the defendant is not entitled to a new trial on this basis.

For these reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNAMARA* and RAKOWSKI, JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument before her death. Justice Daniel McNamara was substituted on the panel. He has listened to the oral argument tape and has read the briefs.