No.  2--96--1436

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Lake County.

)

Plaintiff-Appellee, )

)

) No. 96--CF--42

)

JAMES L. EDWARDS, ) Honorable

) Christopher C. Starck,

Defendant-Appellant. ) Judge, Presiding.

JUSTICE THOMAS delivered the opinion of the court:

On January 17, 1996, defendant, James Edwards, was indicted on three counts of first-degree murder (720 ILCS 5/9--1 (West 1994)).  Following a jury trial, defendant was convicted of first-degree murder and was sentenced to a term of mandatory natural life imprisonment.  This timely appeal followed.

On December 9, 1994, 71-year-old Fred Reckling was found beaten to death inside Grand Appliance, a store he owned in Waukegan, Illinois.  No arrests were made in connection with the murder.  Thirteen months later, on January 4, 1996, defendant was taken into custody for questioning related to an armed robbery of the Roberts Roost Motel in Waukegan.  Defendant confessed to the armed robbery and then indicated to the officers that he had been involved in other criminal incidents.  In a signed statement, defendant said that he got out of prison in 1991 after serving 17 years for murder and admitted to numerous other crimes, including an armed robbery of the Best Inn Hotel in Waukegan, an armed robbery of Hair Crafters beauty salon, and a burglary of a store at South and Genesee in Waukegan.  Defendant also confessed to the murder of a man in New York in 1973 and the murder of a woman in Shaker Heights, Ohio, in 1974.  Defendant also admitted to an armed robbery of a man in North Chicago approximately two years earlier.  Defendant then said that more incidents had happened since he had been released from jail, possibly including more murders, but said that he needed time to think because he sometimes was so high he had trouble remembering the details.

Later in the interrogation, defendant admitted his involvement in the 1995 robbery of First American Bank in Waukegan.  Defendant signed a statement confessing to that robbery.  Defendant eventually admitted that he had committed the murder of Fred Reckling at the Grand Appliance store.  He subsequently signed a typewritten statement confessing to the murder and was videotaped while reading the statement.  Defendant now raises numerous issues on appeal relating to his interrogation and trial.  Additional relevant facts will be discussed in the context of the issues raised on appeal.

Defendant's first issue on appeal is that the State's peremptory challenges against two African-American venire members, Robert L. Hollins, Jr., and Samuel Holmes, violated the equal protection clause as interpreted by 
Batson v. Kentucky
, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).  Defendant maintains that the standard applied by the trial court to determine whether defendant established a 
prima
 
facie
 case of discrimination imposed a burden on him that had been overruled in 
Batson
.  Defendant contends that this case should be remanded to the trial court for a proper 
Batson
 hearing.

The basis for defendant's argument that the trial court applied an improper standard is a comment by the trial court that defendant had not shown a pattern of discrimination by the State.  Defendant claims that this case in similar to 
People v. Wiley
, 156 Ill. 2d 464 (1993), where the Illinois Supreme Court remanded the case for further 
Batson
 proceedings based in part upon the trial court's finding that the State had not excused African-Americans in any systematic manner.  The supreme court stated that the trial court's remarks were reminiscent of the outdated standard applied in 
Swain v. Alabama
, 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965), where a defendant had to prove that a prosecutor engaged in the exclusion of African-Americans in case after case, rather than in his case alone.  
Wiley
, 156 Ill. 2d at 474.   The court stated that while it could not conclude that the trial court had actually applied the outdated 
Swain
 test, it found the trial court's remarks to be improper and misguided.  Because the trial record was insufficient to conduct a 
de
 
novo
 review, the trial court's remarks, along with two additional factors, required a remand to the trial court for further 
Batson
 proceedings.  
Wiley
, 156 Ill. 2d at 474-75. 

We do not find the trial court's comments in this case to be similar to the comments of the trial court in 
Wiley
.  In responding to defendant's objections to the State's peremptory challenges to venire member Robert L. Hollins, Jr., the trial court told defense counsel that he "[had] to get a 
prima
 
facie
 showing to get past the issue.  You have to start with a 
prima
 
facie
 showing of the discriminatory issue by the State."  Defense counsel again noted that Hollins's answers had been without hesitation, and the trial court again said that there had been no 
prima
 
facie
 showing of discrimination.

Later, when defendant objected to the peremptory challenge to venire member Samuel Holmes, the following colloquy ensued:

"THE COURT:  Well, don't you have to show a pattern first before we get to -- it is a two-step process, isn't it?  First you have to show a pattern of discrimination by the State, or they [sic] by you before we need show any reasons.

MR. BRODSKY:  I am not required to show any kind of pattern of discrimination.

THE COURT:  Since when?

MR. BRODSKY: I don't believe I am required to show any pattern.

THE COURT:  First you have to show a 
prima
 
facie
 showing.  Has to be some kind of 
prima
 
facie
 showing before we require them [
sic
] to state a reason."

Defense counsel then noted that Holmes was the last African-American person remaining in the venire and urged the court to ask the prosecutors to offer a race-neutral reason for their exercise of a peremptory challenge to exclude him from service.  The judge denied the defense objection, ruling:

"I don't find a pattern.  I don't find a 
prima
 
facie
 showing to lead me to make an inquiry as to race neutral reason.  Therefore, I am not going to force them to make any kind of discussion at this time."

A 
Batson
 inquiry involves a two-step process.  A defendant must first set forth a 
prima
 
facie
 case of discrimination, and only when a defendant has made out a 
prima
 
facie
 case does the trial court call upon the State to set forth its reasons for the peremptory challenge.  
Wiley
, 156 Ill. 2d at 475.  Here, the trial court clearly stated six times that defendant had to prove a 
prima
 
facie
 case of discrimination and that the defendant had not done so.  Based upon our review of the record, we do not find that the trial court imposed an improper burden on defendant when it referred to a pattern.  In fact, we note that one of the relevant factors in determining whether a defendant has made out a 
prima
 
facie
 case is "whether the State engaged in a 'pattern' of challenges against African-Americans."  
Wiley
, 156 Ill. 2d at 473.  Given the trial court's repeated statement that defendant had to make a 
prima
 
facie
 case, and reviewing the trial court's reference to a "pattern" in  context, we find that the trial court was addressing one of the factors relevant to a 
prima
 
facie
 determination when it referred to a "pattern" of discrimination and was not placing an improper burden on defendant.

Defendant also claims that this case should be remanded for further 
Batson
 proceedings because the trial court erred in finding that he had not established a 
prima
 
facie
 case of discrimination.  Defendant claims that a 
prima
 
facie
 case of discrimination existed because defendant is an African-American and two African-Americans were excused by the State.  Defendant claims that the two challenged venire members showed no prejudice and that the State never explained the reasons for the challenges.

"It is settled that a 
Batson
 
prima
 
facie
 case cannot be established merely by the numbers of black venirepersons stricken by the State."  
People v. Peeples
, 155 Ill. 2d 422, 469 (1993).  To make a 
prima
 
facie
 showing of discrimination under 
Batson
, a defendant must demonstrate that relevant circumstances raise an inference that the State used peremptory challenges to remove venire members based upon their race.  
People v. Williams
, 173 Ill. 2d 48, 71 (1996).  Among the relevant circumstances are whether there was a pattern of strikes against African-American venire members, whether there was a disproportionate use of strikes against such members, the level of African-American representation in the jury venire as compared to the jury, the questions and statements of the State during 
voir
 
dire
, and the race of the defendant, the victim and the witnesses.  
People v. Garrett
, 139 Ill. 2d 189, 203 (1990).  A trial court's determination of whether a defendant has made a 
prima
 
facie
 case will not be reversed unless it is against the manifest weight of the evidence.  
Williams
, 173 Ill. 2d at 71.

In his brief, defendant does not discuss any of the relevant circumstances that raise an inference of discrimination.  Rather, defendant relies upon the fact that he and venire members Hollins and Holmes were all African-American and that Hollins and Holmes had indicated that they could be fair and impartial.  Further, in response to the State's discussion of the relevant circumstances in its response brief, defendant contends that those circumstances are of "questionable relevance" here and again asserts that the relevant factor is that Hollins and Holmes indicated that they would sign guilty verdicts if the State proved defendant guilty beyond a reasonable doubt.  

We are not persuaded that the fact that both Hollins and Holmes indicated that they could be fair establishes a 
prima
 
facie
 case of discrimination.  A venire member who states that he is incapable of being impartial will be stricken for cause and thus would not be subject to a peremptory challenge.  Accordingly, in every 
Batson
 case it will be true that the challenged witness had indicated that he could be fair and impartial.  Defendant's only evidence, then, that the State's exercise of its peremptory challenges was racially motivated was that he and the challenged venire members were African-American.  This fact alone is not sufficient to establish a 
prima
 
facie
 case of discrimination.  
People v. Andrews
, 146 Ill. 2d 413, 430-31 (1992).  Defendant, therefore, did not sustain his burden of establishing a 
prima
 
facie
 case of purposeful discrimination.  See 
Garrett
, 139 Ill. 2d 189 (no finding of discrimination where only evidence offered by defendant was that five out of six peremptory challenges were against African-

Americans).

Defendant also claims that the State should not be insulated from an obligation to explain its peremptory challenges simply because one African-

American juror was accepted on the sworn jury.  Defendant notes that in ruling on his 
Batson
 objection, the trial court said, "Even though we don't need to get to that level, the State has accepted a black juror on this jury * * *."  It is true that a trial court should consider factors other than the number of African-

American persons accepted and excluded by the State in determining a 
prima
 
facie
 case.  
People v. Holman
, 132 Ill. 2d 128, 173 (1989).  Because it is not clear from the trial court's ruling whether the trial court's decision was based upon the fact that the State had accepted an African-American juror, we will review the relevant circumstances in this case despite defendant's failure to submit any evidence concerning those factors, construing any ambiguity in the record against defendant.  See 
People v. Henderson
, 142 Ill. 2d 258, 279-80 (1990).  

In ruling on defendant's 
Batson
 objection, the trial court did not discuss the relevant factors other than stating that it did not find a pattern of discrimination.  Because the relevant circumstances appear in the record before us and are not in dispute, we can, without remanding, determine whether a 
prima
 
facie
 case of discrimination existed.  
Holman
, 132 Ill. 2d at 175.  Upon review, we find several factors refute a finding of purposeful discrimination.  According to the State's brief, which was not disputed by defendant, the State exercised 13 peremptory challenges, 2 of which, or 15%, were against African-Americans.  There were 5 African-Americans in the 70-member venire, or 7.1%.  Two of the five African-American venire members were excused for cause and one woman who had an African-American father and a white mother was accepted on the sworn panel.  We do not find these figures to create a pattern of discrimination.   See 
Henderson
, 142 Ill. 2d at 288 (State's use of six out of 10 peremptory challenges, or 60%, against African-Americans where make up of venire was 30% African-American, was not so disproportionate as to create a pattern of discrimination).  

We also do not agree with defendant and the dissent that, given the low number of African-Americans in the venire, defendant could never show a pattern of discrimination.  We do not believe that the finding of a pattern is limited to those cases where there was a significant number of minorities on the jury venire.  In fact, in a case where the sole Hispanic member of a venire was excused by the State pursuant to a peremptory challenge, the Illinois Supreme Court held that the defendant had alleged "no pattern to the State's use of peremptory challenges against Hispanic jurors which would show purposeful discrimination."  
People v. Pasch
, 152 Ill. 2d 133, 164 (1992).  "A 'pattern' of strikes is created where the strikes affect members of a certain race to such a degree or with such a lack of apparent nonracial motivation that is suggests the possibility of racial motivation."  
Andrews
, 146 Ill. 2d at 429.  In this case, for example, we might be inclined to find a pattern had the State exercised two peremptory challenges against African-Americans and none or few against whites.  On the record before us, however, the facts simply do not suggest a pattern of discrimination in the use of the State's peremptory challenges.

Nor do we find that there was a disproportionate number of peremptory challenges against African-Americans.  Two of the 13 challenges, or 15%,
 
 were against African-Americans, while 10 were against Caucasians and 1 was against a Chinese-American.  See 
People v. Edwards
, 144 Ill. 2d 108, 154 (1991) (no disproportionate use of peremptory challenges when four challenges were made against African-Americans and 10 against Caucasians, even though no African-

Americans were on sworn jury and jury venire had been 10% African-American).  We note that the dissent finds a disproportionate use of peremptory challenges because two of the five African-American venire persons, or 40%, were challenged by the state.  We disagree with this method of analysis as it does not compare the number of challenges to African-Americans with the number of challenges to others.  The Illinois Supreme Court has held that "[t]he number of blacks stricken 
compared to
 the number of nonblacks stricken may reveal whether a disproportionate number of strikes was used to exclude blacks."  (Emphasis added.)  
Andrews
, 146 Ill. 2d at 430.  See also 
Wiley
, 156 Ill. 2d at 478 (Miller, C.J., dissenting) ("The prosecution exercised 45% of its challenges against black members of the venire (5 of 11)"); 
Garrett
, 139 Ill. 2d at 199 ("[W]e accept the following count as accurate: Of the six prospective jurors challenged by the State, five were black (83%)).

The level of African-American representation in the venire (7.1%) did not exceed that in the jury, as the jury panel that was sworn had one African-

American juror out of 12, or 8.3% representation.  The heterogeneity of Hollins and Holmes also tends to refute a finding of discrimination.  The answers of Hollins and Holmes during 
voir
 
dire
 raised some question concerning their ability to serve on the jury and, thus, the men shared a characteristic other than race.  See 
Henderson
, 142 Ill. 2d at 290 (sole concern of reviewing court is whether stricken venire members shared characteristic other than race; court need not search for reasons for challenge or for similarities between stricken African-

American and non-challenged white venire members). 

Two of the relevant factors are neutral.  The trial court conducted the 
voir
 
dire
 of the venire, so there were no statements or questions by the State during 
voir
 
dire
 that implied purposeful racial discrimination.  There also was no evidence concerning whether the race of the witnesses differed from that of defendant, so we also consider this factor to be neutral.  

The only relevant factor we find that suggests purposeful discrimination, in addition to the racial identity between defendant and Hollins and Holmes, is that defendant is African-American and the victim was white.  See 
Williams
, 173 Ill. 2d at 74-75 (fact that defendant was African-American and victim was white may suggest an inference of discrimination).  Because the majority of the relevant factors either refute an inference of purposeful discrimination or are neutral, we cannot say that the trial court's conclusion that defendant failed to establish a 
prima
 
facie
 case of discrimination was against the manifest weight of the evidence.  See 
Williams
, 173 Ill. 2d at 75 (where interracial nature of crime and racial identity between defendant and excluded venire members were only factors suggesting purposeful discrimination, trial court's finding of no discrimination was not against manifest weight of the evidence). 

We further note that, even if we agreed with defendant that he had established a 
prima
 
facie
 case of discrimination, and we emphasize that we do not, we nonetheless would find that the State had offered race-neutral reasons for excluding Hollins and Holmes.  We are mindful of the fact that a court should not presume or infer an unarticulated race-neutral explanation from the facts of the case.  
People v. Harris
, 129 Ill. 2d 123, 184 (1989).  We note that the trial court did not require the State to explain its reasons for challenging Hollins and Holmes during 
voir
 
dire
.  The State, however, did set forth its reasons when it responded to defendant's posttrial motion.  In its response to defendant's posttrial motion, the State said that it challenged Hollins because he had been arrested in a case of mistaken identity and because he had a nephew in jail in Lake County.  With regard to Holmes, the State said that its challenge was based upon the way he spoke, his manner in answering questions, and his inattention to detail.  

During 
voir
 
dire
, Hollins testified that three or four years earlier he had been arrested for home invasion when the crime victims identified him as the perpetrator.  Hollins was held in the county jail for a few months as he tried to prove his innocence.  He was released when it was determined that the arrest was based on a case of mistaken identity.  Hollins told the trial court, "I have no harsh feelings about [the incident] because I [would have] probably did the same thing if I was a police officer."  He also said that he did not have any bad feelings toward the State's Attorney's office "as long as they're doing their job the right way."  He testified that the experience would not affect his performance as a juror.  Hollins also said the fact that a nephew of his had been convicted for burglary would not affect his judgment.  He had not attended any of the hearings related to the nephew's crime and had no opinion as to whether his nephew was treated fairly.

Venire member Samuel Holmes stated that he had lived in Lake County for nine years and was employed by the Lake County health department.  He said that he had been robbed by two African-American men in Waukegan six or seven years previous to the trial.  However, Holmes stated that this experience would not affect his ability to serve as a juror.  He indicated that he understood the presumption of defendant's innocence and the State's burden of proof and said he could sign a guilty verdict if the State met its burden.  The following exchange then took place between the trial court and Holmes:

"THE COURT: You may be required as a juror to look at some rather graphic photographs about injuries and the scene of the occurrence and hear testimony about that.  Can you be fair and impartial in spite of those graphic photographs?

HOLMES: I don't think so.

THE COURT: You think that if you see photographs that show some serious injuries and a bloody scene that you would find the Defendant guilty of this just because of the photographs?

HOLMES: Well, it is kind of on the evidence and then and the photos.  It would be hard to say.

THE COURT: Just showing photographs of severe injuries, does that cause you concern about being fair to the State and fair to the Defendant?

HOLMES: I don't think so."

Later, at the State's request, the trial court asked Holmes about his response to a question on his juror questionnaire.  The trial court said, "You say you live in Chicago now?"  Holmes said that he did not live in Chicago.  When asked if the answer on his questionnaire was a mistake, Holmes said, "I think it said which city was I living at before I moved to Waukegan."

 With regard to Hollins, we find the State's explanation that it challenged him because he had been arrested and held for several months on an erroneous charge to be a race-neutral reason for the peremptory challenge.  A race-neutral reason is based upon something other than the race of the juror.  
People v. Munson
, 171 Ill. 2d 158, 174-75 (1996).  Likewise, with regard to Holmes, we believe the State's explanation that he indicated he might not be fair and impartial after viewing graphic photographs; that he appeared somewhat careless in completing his juror questionnaire also was a race-neutral explanation.  The State may properly exercise a peremptory challenge based upon an individual's courtroom conduct or demeanor, including hesitation in answering questions.  
Munson
, 171 Ill. 2d at 178.  Because the record in this case establishes sufficient race-neutral reasons for the peremptory challenges to venire members Hollins and Holmes, we affirm the trial court's denial of defendant's 
Batson
 motion.

Defendant's next issue on appeal is that the trial court committed reversible error when it denied his motion to suppress a statement that he made concerning the murder of Fred Reckling.  Defendant claims that he was interrogated for 26 hours concerning the Roberts Roost robbery and other crimes by two teams of police officers, with only short breaks for sleep and food.  Defendant contends that he invoked his right to silence with regard to the murder of Fred Reckling but the officers repeatedly ignored his right to silence and engaged in conduct which was oppressive, arbitrary, and unreasonable in order to obtain his statement.

A trial court's ruling on a motion to suppress will not be disturbed unless the ruling is against the manifest weight of the evidence.  
People v. Miller
, 173 Ill. 2d 167, 181 (1996).  Once an individual indicates in any manner prior to or during questioning that he wishes to remain silent, the interrogation of the individual must cease.  
Miranda v. Arizona
, 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28 (1966).  However, a statement made by a defendant who earlier had invoked his right to remain silent is admissible if the police scrupulously honored the defendant's right to cut off questioning.  
People v. Batac
, 259 Ill. App. 3d 415, 424 (1994).

Before addressing defendant's claim that his right to cut off questioning was not scrupulously honored, we must first determine whether defendant had invoked his right to remain silent.  An individual's demand to end the interview must be specific.  
People v. Pierce
, 223 Ill. App. 3d 423, 429 (1991).  Thus, a reviewing court has held that a defendant did not invoke his right to silence when he said to questioning officers, "I think you got enough," "Okay, now have you got enough," "there's nothing I want to add to it," and "you've got everything you need here now."  
People v. Aldridge
, 68 Ill. App. 3d 181, 186-87 (1979), 
aff'd
, 79 Ill. 2d 87 (1980).  In affirming that case, the Illinois Supreme Court noted that the defendant was not attempting to terminate questioning but was merely resisting answering questions concerning particular details of the offense to which he had confessed.  
People v. Aldridge
, 79 Ill. 2d 87, 95 (1980).  

Likewise, a defendant did not invoke his right to remain silent where, when informed of his right to remain silent, he said, "If I don't want to answer any more questions, then what happens[]," "You got all the stuff there right now.  You don't need no more really," and "I told you, though, once that ...[.]"  
People v. Pierce
, 223 Ill. App. 3d 423, 430-31 (1992).  A defendant also did not invoke his right to silence when, during questioning concerning the murder of his son, he said, "I'm tired, I can't answer no more."  
People v. Milner
, 123 Ill. App. 3d 656, 658 (1984).  Further, even where a defendant refused to sign a waiver of his 
Miranda
 rights, asked what benefit he might receive if he made a statement, and then initially indicated an unwillingness to talk about 10 armed robberies, this court has held that a defendant did not invoke his right to silence.  
People v. Downey
, 162 Ill. App. 3d 322, 337 (1987).

In this case, defendant was arrested around 7:55 p.m. on January 4, 1996 in connection with an armed robbery at the Roberts Roost Motel.  Around 10:17 that evening, defendant was interviewed by Officers Mark Tkadletz and Mike Quinn.  Quinn read defendant his 
Miranda
 rights and defendant then read and signed a written waiver of rights.  The interview of defendant continued on and off until around midnight the next day, January 5, 1996.  During the day of January 5, 1996, defendant was questioned by Officers Artis Yancey and Luis Marquez and in the evening was questioned by Officers Tkadletz and Quinn.  The interrogation of defendant, however, was not continuous and included breaks for meals, the bathroom, a nap in the interview room, and several hours of sleep in a cell.  There also were times during the interview process where defendant was left alone in the interview room while the officers tried to confirm details of the crimes to which defendant had confessed and while the officers typed up defendant's statements.  During the interrogation, defendant confessed to numerous felonies, including four murders, five armed robberies, and a burglary.  The officers that questioned defendant testified that defendant was very friendly and talkative and, after he confessed to the Roberts Roost armed robbery, began to extensively relate details of his life and his background, including details concerning the other crimes he had committed.  

Officer Tkadletz testified that when he and Quinn interviewed him, defendant told the officers that there were other incidents out there that he did not want to bring up because he "didn't want to open up a can of worms" and asked the officers if they could promise that he would not get the death penalty.  The officers said that they could not make that promise.  Quinn testified that he asked defendant if he had any knowledge about a homicide at Grand Appliance and defendant said, "No, you're talking about death penalty stuff."  Later, when defendant was interviewed by Officer Marquez about other crimes he may have committed, Marquez testified that defendant said he did not want to go in that direction because he would be opening up a can of worms.  Later, defendant said that he would be willing to tell the truth about a particular incident if his wife told him to tell the truth.  Quinn then went to defendant's home and arranged for defendant's wife to call him.  Defendant's wife spoke with him on the telephone and told him to tell the truth, following which defendant confessed to the murder of Fred Reckling at Grand Appliance.  Prior to trial, defendant filed a motion to suppress his statement.  The trial court denied defendant's motion, finding that defendant had not invoked his right to silence.

Based upon our review of the record, we agree with the trial court that defendant did not invoke his right to silence.  Defendant's comments in this case were similar to the comments in the foregoing cases which were found not to invoke a defendant's right to silence.  For example, defendant's response of "No, you're talking about death penalty stuff," was in response to a question of whether defendant had any knowledge of the murder at Grand Appliance.  With regard to this comment, we find that defendant was denying knowledge of the crime and was not invoking his right to remain silent.  Defendant's comments about opening a can of worms also did not amount to a refusal to talk to the officers about the incident but rather indicated that defendant did not wish to admit culpability for the murder.  While we recognize that in some cases language less strong than "no" could be construed as invoking a right to silence, defendant's comments in this case did not rise to that level.  Because defendant had not invoked his right to silence before making his statement, the trial court properly denied defendant's motion to suppress.

Defendant next contends that he was denied his right to a fair trial because the State was allowed to introduce evidence of other crimes at trial, namely, three armed robberies.  Prior to trial, defendant had filed a motion 
in
 
limine
 to bar evidence of other crimes.  The trial court held that evidence of other crimes was not admissible as 
modus
 
operandi
 evidence but reserved ruling on whether other crimes evidence would be admissible to corroborate the reliability of defendant's statement.  Following defendant's cross-examination of Officer Tkadletz, the trial court held that evidence of other crimes would be admitted because the cross-examination of Tkadletz had cast grave doubts on the believability of defendant's statement by suggesting that Tkadletz had either drafted the statement or had planted the seeds for the statement in defendant's mind.  The trial court held, however, that evidence of other murders committed by defendant would not be admitted because the prejudicial effect of that evidence would outweigh its probative value.  Defendant now argues that the trial court's ruling constituted reversible error or, in the alternative, that the admission of the other crimes evidence was due to the ineffective assistance of counsel and, therefore, he is entitled to a new trial.

In response, the State argues that the evidence of other crimes was properly allowed, and in support of its argument cites 
People v. King
, 109 Ill. 2d 514 (1986), and 
People v. Tellez
, 235 Ill. App. 3d 542 (1992).  In 
King
, the defendant argued that he was denied a fair trial due to the admission of evidence concerning an armed robbery in his trial for murder and armed robbery.  
King
, 109 Ill. 2d at 530.  The Illinois Supreme Court held that because the defendant had asserted that the police had coerced him into making an untrue confession to the murder and armed robbery, evidence regarding the other armed robbery was relevant to establish the accuracy of the confession and, thus, was properly admitted.  
King
, 109 Ill. 2d at 530-31.

Likewise in 
Tellez
, the reviewing court held that evidence of the defendant's involvement in another murder was properly admitted in the defendant's murder trial because it refuted the defendant's claim that his confession to the murder for which he was on trial was false.  
Tellez
, 235 Ill. App. 3d at 555.  Citing 
King
, the court noted that evidence of the commission of other crimes may be relevant to establish the validity and accuracy of a confession which the defendant claimed was untrue or coerced.  
Tellez
, 235 Ill. App. 3d at 554.

A trial court's decision concerning the admissibility of other crimes evidence will not be disturbed on review absent a clear abuse of discretion.  
Tellez
, 235 Ill. App. 3d at 555.  Upon reviewing the record in this case, we cannot say that the trial court abused its discretion in allowing the State to present evidence of three other robberies committed by defendant.  Defendant's cross-examination of Officer Tkadletz implied that defendant's confession concerning Fred Reckling's murder contained only the information that was known to Tkadletz about the murder and that it did not contain any details of which Tkadletz was unaware.  The clear impact of the cross-examination was to suggest that Tkadletz had fabricated defendant's confession and coerced him into signing it.  Accordingly, the trial court properly allowed the State to rebut that inference.  

We note that in allowing the other crimes evidence, the trial court carefully weighed the prejudice to defendant and excluded any evidence of other murders committed by defendant as too prejudicial.  Any prejudice to defendant was further diminished because the other crimes evidence was limited to the armed robberies at Roberts Roost, Best Inn, and Hair Crafters, even though defendant had confessed to as many as nine other crimes when making his statements.  In addition, before allowing testimony concerning the other crimes, the trial court told the jury that the testimony was to be considered only as those statements related to the truthfulness, believability, or accuracy of defendant's statement in the present case.  The State did not call any victims or witnesses to the other crimes to testify and instead called Officer Quinn to testify concerning defendant's statements about the three armed robberies.  The State then called other officers to testify concerning the details of those armed robberies and that the victims of the armed robberies had identified defendant as the perpetrator of those robberies.   Because defendant chose to attack the veracity of his statement through the cross-examination of Tkadletz, the trial court did not abuse its discretion in allowing the State to present evidence of other crimes to refute the claim that defendant's statement was false.

We also do not find that defendant's counsel was ineffective in opening the door to other crimes evidence.  Counsel's effectiveness is determined by the totality of his conduct, and a reviewing court will not inquire into areas involving the exercise of judgment, discretion, trial tactics, or strategy.  
People v. Gapski
, 283 Ill. App. 3d 937, 942 (1996).  In denying defendant's posttrial motion, the trial court noted that defense counsel was in the difficult position of either letting defendant's confession go to the jury unchallenged, or challenging the confession and thereby opening the door to evidence of other crimes.  The trial court held that the decision was a matter of tactics.  We agree that the decision of defense counsel was a matter of trial tactics or strategy and, therefore, will not now second-guess defense counsel's decision.  Defendant was not denied effective assistance of counsel in this case.  

Defendant next claims that he was unfairly surprised and prejudiced when Officer Yancey, one of the officers that had interrogated him, testified to a hypothetical statement allegedly made by defendant concerning how he would have carried out the murder of Fred Reckling.  Defendant argues that this statement was never revealed until Yancey testified to it on direct examination at trial.  On direct examination, Yancey testified that the subject of Fred Reckling's murder came up three times during his interrogation of defendant.  When asked what defendant said when the subject came up for a third time, Yancey responded:

"His answer to that question at that time was he -- I guess the way he said it was he kind of theorized, you know, in a hypothetical situation how he would have -- if he had been involved in that, how he would have carried out the incident."

In response to defendant's objection that he had never heard of this statement before, the trial court barred the State from going into the statement further and instructed the jurors to strike the statement but denied defendant's motion for a mistrial.  Defendant now claims that the State violated Illinois Supreme Court Rule 412(a)(ii) (134 Ill. 2d R. 412(a)(ii)) by not disclosing the statement.  Defendant further argues that the trial court committed reversible error in denying defendant's motion for a mistrial because Yancey's testimony had irreparably prejudiced him by suggesting that defendant had made a third confession to the murder.

Supreme Court Rule 412(a)(ii) requires the State to disclose any written or recorded statements or the substance of any oral statements to the defendant upon written motion and also to disclose a list of witnesses to the making and acknowledgment of such statements.  134 Ill. 2d R. 412(a)(ii).  It is no excuse that the police did not advise the State of the statement.  
People v. Young
, 59 Ill. App. 3d 254, 257 (1978).  A trial court's judgment concerning a violation of Supreme Court Rule 412(a)(ii) is entitled to great weight, although a reviewing court will find an abuse of discretion when a defendant is prejudiced by a discovery violation and the trial court fails to eliminate that prejudice.  
People v. Weaver
, 92 Ill. 2d 545, 559 (1982).

It is true that in some cases, the possible impact on the jury of a previously undisclosed confession is incalculable and even an admonition to the jury to disregard the testimony may not overcome the potential prejudice to a defendant.  
People v. Valdez
, 230 Ill. App. 3d 975, 984-85 (1992).  In general, however, an admonition to the jury to disregard testimony will relieve prejudice to a defendant and will cure any error.  
People v. Romero
, 189 Ill. App. 3d 749, 758 (1989).  We find that in this case, the trial court's actions in barring the State from inquiring further into the statement and its admonition to the jury to disregard Yancey's statement were sufficient to overcome any potential prejudice to defendant.  Any testimony that defendant may have confessed to the murder of Fred Reckling to Yancey was cumulative of other testimony in the case concerning defendant's confession of the crime, including defendant's written and videotaped confession.  Consequently, the trial court properly denied defendant's motion for a mistrial.  

Defendant next contends that the trial court abused its discretion when it denied his request to reopen his case following the State's closing rebuttal argument to the jury.  In rebuttal, Jeffery Pavletic, the chief deputy State's Attorney, reviewed the defenses not used in the case, including temporary insanity, self-defense, accident, alibi, and noted that the only defense left was that the police were lying.  With regard to the last defense, Mr. Pavletic argued:

"You know, if these cops were liars, why didn't they solve this crime 13 months ago?  If they are liars, they have made I am sure hundreds and hundreds of arrests during that 13-month period of time.  Why didn't they pick on one of those other people who just committed a crime?  Why didn't they pick one of those people 13 months before the Defendant walks through the door?  Why didn't they pick on one of them, force them into confession, if they are out to railroad an innocent man?"

Defendant objected to this argument and, after the State concluded its argument, asked the trial court to instruct the jury to disregard the argument or to allow him to reopen his case to present evidence that the police had interrogated a former employee of Grand Appliance, Ian Duffy, in connection with the murder of Fred Reckling.  The trial court denied defendant's request.  On appeal, defendant claims that the State's argument raised a new issue and that he should have been allowed to rebut that issue through the presentation of evidence.

In response, the State contends that the proper issue on appeal is whether its comment was an improper comment, not whether defendant should have been allowed to reopen his case.  The State then argues that the comments in its rebuttal argument were invited by defendant's closing argument.  Specifically, the State points to the following arguments of defense counsel:

"But consider this.  Detective Tkadletz and Detective Quinn already had a certain impression of [defendant] when they talked to him.  They had an impression of him that he was a bad actor, that he did some bad things, so why not, why not make this bad person confess to the only unsolved murder case in Waukegan?

* * *

They [the detectives] want you to believe that what happened in that interrogation room is all pleasantness, there was no coercion, nothing done to force a statement.

* * *

[W]hen you look at this entire statement, it is not true.  None of it is. * * * 

When you take this statement, Ladies and Gentlemen, from behind the closed doors of the police office, from that interrogation room, you try to match it to reality, you try to match it to the careful work that the other police officers did, it doesn't match."

We agree with the State that the threshold issue here is whether the prosecutor made improper comments in his closing argument.  A prosecutor is given a great deal of latitude in closing argument.  
People v. Hudson
, 157 Ill. 2d 401, 441 (1993).  In reviewing allegations of error in closing argument, this court must examine in their entirety the arguments of the prosecution and defense to place the comments at issue in the proper context.  
People v. Jordan
, 205 Ill. App. 3d 116, 122 (1990).  Comments made by prosecutors on rebuttal will not be considered improper if they appear to have been provoked or invited by defense counsel's argument.  
People v. Johnson
, 254 Ill. App. 3d 74, 83 (1993).  Further, this court will not reverse a trial court's determination concerning the propriety of a prosecutor's closing remarks absent an abuse of discretion.  
Hudson
, 157 Ill. 2d at 441.

Examining the closing arguments of the State and the defendant in this case, we agree with the State that its comments in rebuttal were invited by defendant.  Defendant argued in closing that the police officers had decided to make him confess to the only unsolved murder in Waukegan.  Consequently, it was reasonable for the State to argue on rebuttal that if the police officers simply wanted to pin the murder on someone, they could have picked anyone that they had arrested in the past 13 months.  This argument clearly was in response to defendant's closing argument and was not error.  Because the statement was invited by defendant's argument in closing, we do not find that the statement raised a new issue or opened the door to testimony concerning Ian Duffy.  The trial court, therefore, properly denied defendant's motion to reopen the case.

Defendant's final argument on appeal is that he was not proven guilty beyond a reasonable doubt.  Defendant claims that there are significant conflicts between his confession and the facts surrounding the murder of Fred Reckling.  Defendant argues that because the only evidence against him was his confession, which deviated in significant respects from the evidence, no rational jury could have found him guilty beyond a reasonable doubt.

Defendant is correct in asserting that an uncorroborated confession generally is insufficient to support a conviction.  
People v. Mendoza
, 208 Ill. App. 3d 183, 203 (1991).  The corroboration necessary to support a conviction based upon a defendant's confession is provided by proof of the 
corpus
 
delicti
 of the offense, which in a murder case consists of the fact of death and that the death was caused by the criminal agency of another.  
Mendoza
, 208 Ill. App. 3d at 203.  The corroborating evidence, however, need not rise to the level of proof beyond a reasonable doubt, but instead need only tend to confirm a defendant's confession.  
People v. Cloutier
, 156 Ill. 2d 483, 503 (1993).  Every detail of the confession need not correspond to the independent evidence in every particular.  
Mendoza
, 208 Ill. App. 3d at 204.  

Here, there was sufficient independent evidence tending to confirm defendant's confession.  The death of Fred Reckling was caused by the criminal agency of another.  The pathologist that conducted the autopsy of Reckling testified that the cause of death was multiple blunt-force injuries, most likely from a long and heavy but irregularly surfaced object.  Defendant's confession was consistent with the pathologist's testimony concerning the manner and cause of Reckling's death.  In his confession, defendant said that he hit Reckling a number of times with a 3½-foot-long grooved mahogany or oak stick.  The 
corpus
 
delicti
 thus provides the corroboration necessary to sustain defendant's conviction.

Nonetheless, defendant cites numerous alleged inconsistencies between his confession and the evidence presented at trial that he asserts raise a reasonable doubt concerning his guilt.  As noted, however, defendant's confession and the evidence presented need not correspond in every detail.  
Mendoza
, 208 Ill. App. 3d at 204.  Further, where the evidence is conflicting, this court will not substitute its judgment for that of the trier of fact.  
Mendoza
, 208 Ill. App. 3d at 204.  A conviction should be reversed only where the record leaves the reviewing court with a grave and substantial doubt concerning a defendant's guilt.  
Mendoza
, 208 Ill. App. 3d at 204.  

Upon reviewing the substantial record in this case, which included the testimony of 42 witnesses, we find that the circumstances related in defendant's confession were confirmed by corroborating evidence.  Any conflicts between defendant's confession and the evidence could be explained by defendant's admission in his statement concerning the Roberts Roost robbery that sometimes he was so high he had trouble remembering details.  In any event, it was the responsibility of the trier of fact to resolve any conflicts in the evidence, and we will not substitute our judgment for that of the fact finder on those issues.  We cannot say that the evidence was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt concerning defendant's guilt.

For all of the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, J., concurs.

JUSTICE RATHJE, specially concurring in part and dissenting in part:

I respectfully dissent.  This case should be remanded for a 
Batson
 hearing regarding venire members Hollins and Holmes. I concur with the rest of the majority's opinion.

In 
Williams
, our supreme court discussed the relevant standard of review:

"In 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court established a three-step process for evaluating a claim that the State has exercised its peremptory challenges in a racially discriminatory manner.  First, the defendant must establish a 
prima facie
 case of purposeful discrimination in the selection of the jury.  Once the defendant establishes a 
prima facie
 case, the burden shifts to the State to articulate a race-neutral reason for challenging each of the venirepersons in question.  Finally, the trial judge must consider those explanations and determine whether the defendant has met his burden of establishing a purposeful discrimination. [Citation.]  

A 
prima facie
 showing of discrimination under 
Batson
 requires the defendant to demonstrate that relevant circumstances in the case raise an inference that the prosecutor exercised peremptory challenges to remove venirepersons based upon their race. [Citations.] In determining whether a 
prima facie
 case of discriminatory jury selection has been established, the following relevant circumstances should be considered: (1) racial identity between the defendant and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during 
voir dire
 examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses.  [Citations.]  A trial judge's determination of whether a 
prima facie
 case has been shown will not be overturned unless it is against the manifest weight of the evidence."  
Williams
, 173 Ill. 2d at 70-71. 

However, when it appears that the trial court has not properly applied the 
Batson
 test, a case shall be remanded for further 
Batson
 proceedings.  See, 
e.g.
, 
People v. Wiley
, 156 Ill. 2d 464, 474-75 (1993) (where trial court had apparently applied the outdated 
Swain
 test, cause was remanded for further proceedings pursuant to 
Batson)
.

Two African-American venire members, Robert L. Hollins, Jr., and Samuel Holmes, were excused due to peremptory challenges posed by the State.  The following is a brief review of the questioning of these two prospective jurors and subsequent discussions regarding same.

Robert L. Hollins, Jr., testified that he had lived in Lake County for 11 years.  He was married with  five children.  He was disabled due to a leg injury from a work accident, but he did not take any medication that would affect his ability to concentrate.  A brother of Hollins was a police officer in Mississippi.  He stated that he was a "very active" member of a neighborhood watch group.  In that capacity, he regularly talked with local police officers and had even played football with them in prior years.  Hollins said that he found most of the officers with whom he had contact "to be pretty honest."  Three or four years prior to the subject trial, Hollins had been arrested for home invasion and detained in the county jail for a couple of months.  He was released when it was determined that the arrest was based on a case of mistaken identity.  Hollins told the trial court, "I have no harsh feelings about [the incident] because I [would have] probably did the same thing if I was a police officer."  He testified that the experience would not affect his performance as a juror.  Similarly, Hollins said the fact that a nephew of his had been convicted for burglary would not affect his judgment.  He had not attended any of the hearings related to the nephew's crime and had no opinion as to how he was treated.

Further, Hollins recalled hearing only one news report about this case but could not remember its content.  He said he would base his decision "on the evidence and the evidence only."  Hollins stated that he had not formed an opinion about whether the defendant was guilty or innocent.  He understood that a defendant was presumed innocent until proved guilty.  He knew the State's burden of proof and said that he would be willing to return a guilty verdict if the State met that burden.  Hollins believed in the death penalty "when it's necessary."  His decision as to whether to impose the death sentence would depend on the evidence.

When the questioning of Hollins ended, the State exercised a peremptory challenge against him.  Defense counsel, David Brodsky, objected to the State's use of a peremptory challenge, noting that Hollins, an African-American, had answered the questions appropriately.  The trial court told defense counsel that he "[had] to get a 
prima facie
 showing to get past the issue.  You have to start with a 
prima facie
 showing of the discriminatory issue by the State."  Defense counsel responded by noting that with "so few blacks" in the jury pool "that would be an impossible burden for us to meet." A discussion ensued about the State's acceptance of one mixed-race juror, and the trial court expressed the view that the State could have been concerned about Hollins' erroneous arrest and jail experience.  Then the following colloquy took place.

"MR. BRODSKY:  I mean his answers, your Honor, were without hesitation.

THE COURT:  No question.  No question.  That certainly isn't a reason for cause, but I can see why it would give them some concern.  Even though we don't need to get to that level, the State has accepted a black juror on this jury and the Court thinks that there could be some explanation.  So there's no 
prima facie
 showing, so I'm not going to go any further than that other than to note he is a black gentleman of 33 years of age.  Other than that the record should speak for itself of his questions and answers.  So over the objection of the defense, he is excused by the State on their [
sic
] motion and their challenge."

Later in the 
voir dire
, venire member Samuel Holmes was questioned by the trial court.  He stated that he had lived in Lake County for nine years and was employed by the Lake County health department.  Holmes stated that he did not know the defendant or any of the lawyers or witnesses and that he had never heard of the case before being called for jury service.  He said that he had been robbed by two African-American men in Waukegan six or seven years previous to the trial.  However, Holmes stated that this experience would not affect his ability to serve as a juror.  He indicated that he understood the presumption of defendant's innocence and the State's burden of proof and said he could sign a guilty verdict if the State met its burden.  According to Holmes, neither the race of the defendant nor the race of the victim would affect his judgment.  He was not opposed to the death penalty and said he could vote to impose it, depending on the evidence.

The State exercised a peremptory challenge against Holmes.  Once again, defense counsel objected, noting that Holmes was an African-American and arguing that "[t]here is absolutely no reason for excusing this man whatsoever."  The following colloquy then ensued.

"THE COURT:  
Well, don't you have to show a pattern first before we get to--it is a two step process, isn't it?  First you have to show a pattern of discrimination by the State, or they [sic] by you before we need show any reasons
.

MR. BRODSKY:  I am not required to show any kind of pattern of discrimination.

THE COURT:  Since when?

MR. BRODSKY: I don't believe I am required to show any pattern.

THE COURT:  First you have to show a 
prima facie
 showing.  Has to be some kind of 
prima facie
 showing before we require them [
sic
] to state a reason."  (Emphasis added.)

In response, defense counsel responded by noting that Holmes unhesitatingly answered all questions indicating that he would be fair and impartial and that he could impose the death penalty.  Whereupon, the following discussion took place:

"MR. BRODSKY:  That is a 
prima facie
 showing.  They [
sic
] have had jurors, every juror that was white that answered questions exactly the same way this person did was allowed on the jury.

MR. PAVLETIC [Prosecutor]:  That is ridiculous.  The record will stand on whether there is any basis in fact for what he just said on that last statement.  There is no basis of fact in that.

MR. BRODSKY:  It is absolutely true, Judge; and this man has a right, my client has a right to be able to have minority representation on this jury and to not have him excluded for that singular reason.  There is no other reason.  Where he lives, we have jurors accepted from where he lives.  You know, I mean there is no, absolutely no reason to have him excused in this particular case.

THE COURT:  What do you say about all this?

MR. PAVLETIC:  Judge, it has to be established number one.  I would just indicate for the record that we have accepted an African-American on this jury, that two were excused by the Court for cause, and one had been rejected as the Court allowed the record to reflect because he had been locked up in Lake County Jail on a crime that he felt he was unjustly charged on, on a crime that he said he then had to prove his innocence in order to be removed.

That is the history of the African-Americans who have been on this venire.  There is no basis for their 
Batson
 challenge.  There is no pattern of discrimination in this case, and the State concurs with what the Court has already indicated regarding what has to be shown on a 
prima facie
 level for 
Batson
 challenge."

Defense counsel then noted that Holmes was the last African-American person remaining in the venire and urged the court to ask the prosecutors to offer a race-neutral reason for their exercise of a peremptory to exclude him from service.  The judge denied the defense objection, ruling:

"THE COURT:  
I don't find a pattern
.  I don't find a 
prima facie
 showing to lead me to make an inquiry as to race neutral reason.  Therefore, I am not going to force them to make any kind of discussion at this time."  (Emphasis added.)

The record reveals the following pertinent evidence.  The victim was a Caucasian male, and the defendant is an African-American male.  In its brief, the State represents, and defendant does not dispute, that there were 5 African-

Americans in the 70-member venire.  A woman who had an African-American parent and a Caucasian parent was accepted by the State to serve on the subject jury.  Two other African-Americans were subject to joint motions to excuse them for cause.  The record further shows that 64 venirepersons were questioned during 
voir dire
.  Twenty-two venirepersons were excused for cause, including the two aforementioned African-Americans.  Defendant exercised 15 peremptory challenges, 13 of which were used to excuse Caucasian males and 2 used to excuse Caucasian females.  The State exercised 13 peremptory challenges, excusing 6 Caucasian females, 4 Caucasian males, and 2 African-American males.  The jury that was finally selected contained an African-American female and a Chinese-American male.

Initially, defendant argues that the trial court applied an improper test to deny defendant's 
Batson
 objections regarding venire members Hollins and Holmes.  The trial court's remarks regarding said objections create a similar type of concern to that which was discussed in 
People v. Wiley
, 156 Ill. 2d 464 (1993).  In 
Wiley, 
six African-American venirepersons were excused pursuant to the State's peremptory challenges.  At the close of 
voir dire
 defendant filed a motion for a mistrial, challenging the State's use of its peremptories to excuse five African-American venirepersons.  The trial court denied the motion, stating, 
inter alia
, that it perceived no "systematic exclusion" of African-Americans from the jury.  
Wiley
, 156 Ill. 2d at 470.  The 
Wiley
 court noted that the trial court's finding of no systematic exclusion of African-American veniremen was reminiscent of 
Swain v. Alabama
, 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965), which had acknowledged that there were possible constitutional violations where the prosecution excluded African-Americans  " 'in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be.' " 
Wiley
, 156 Ill. 2d at 464, quoting  
Swain
, 380 U.S. at 223, 13 L. Ed. 774, 85 S. Ct. at 837.  The 
Wiley
 court further noted that 
Batson
 had " 'changed the burden of proving the State's racial discrimination by allowing a defendant to rely solely on the facts of his case.' "  
Wiley
, 156 Ill. 2d 474, quoting 
People v. Pecor
, 153 Ill. 2d 109, 123 (1992).  The 
Wiley
 court concluded:

"Although we cannot conclude on the present record that the trial court undertook a strict and literal application of the outdated 
Swain
 test in the instant cause, 
we nevertheless find the remarks made by the trial court were improper and misguided
.  Their occurrence is an integral part of our decision to remand the matter for further 
Batson
 proceedings."  (Emphasis added.)  
Wiley
, 156 Ill. 2d at 474-75.

Like the 
Wiley
 court, I am not certain that the trial court was strictly and literally applying an improper test in the instant appeal.  Nevertheless, its remarks in the discussion of the Holmes peremptory challenge, regarding the necessity of defendant's  proving a pattern of discrimination before going to the second step of the 
Batson
 test, raise significant concerns.  Also like the 
Wiley
 court, I find the trial court's remarks as to the defendant's burden to be improper and misguided.  I do not believe that either 
Batson
 or its progeny 
require
 a defendant, where there are only a few African-American venirepersons and there are only one or two disputed peremptory challenges, to put forward, as part of his 
prima facie
 case, evidence of a pattern of discrimination.  Such a pattern of discrimination would be impossible to prove if, for example, there was only one African-American in a venire and that venireperson had been peremptorily challenged by the State.  Further, in cases such as this, where the number of African-Americans in the venire is small and the number of disputed peremptory challenges is small, proof of a pattern would be virtually impossible to put forward.  Yet it is clear that the exclusion of even 
one venireperson
 on account of race is a constitutional violation and would be a sufficient basis to accord a defendant a new trial.  
Wiley
, 156 Ill. 2d at 476.

A pattern of discrimination in the State's peremptory challenges may indeed be a relevant factor to consider in determining whether a 
prima facie
 case of discrimination has been established.  However, it cannot be applied by the trial court as a prerequisite, in a case such as this, to proving a 
prima facie
 case.  That would put the type of burden on defendant that 
Batson
 was designed to eradicate.  Indeed, the 
Batson
 court recognized that it would be unwise to set down a hard and fast list of factors to be applied to determine whether a 
prima facie
 case of discrimination had been established.  It specifically stated, "We have confidence that trial judges, experienced in supervising 
voir dire
, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a 
prima facie
 case of discrimination against black jurors."  
Batson
, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

A further impropriety in the trial court's denial of the objection to the Hollins peremptory challenge was the apparently inordinate emphasis it placed on the State's acceptance of an African-American venireperson.  To reiterate, in denying the subject objection, the trial court stated:

"THE COURT:  No question.  No question.  That certainly isn't a reason for cause, but I can see why it would give them some concern.  Even though we don't need to get to that level, 
the State has accepted a black juror
 on this jury and the Court thinks that there could be some explanation.  So there's no 
prima facie
 showing, so I'm not going to go any further than that other than to note he is a black gentleman of 33 years of age.  Other than that the record should speak for itself of his questions and answers.  So over the objection of the defense, he is excused by the State on their motion and their challenge."  (Emphasis added.)

In the context of the Hollins 
voir dire
, the trial court's substantial reliance on the fact that an African-American juror had already been impaneled was erroneous in determining whether the Hollins peremptory challenge was purposeful discrimination by the State.

As the 
Batson
 court wrote, " 'A single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' "  
Batson
, 476 U.S. at 95, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722, quoting 
Village of Arlington Heights v. Metropolitan Housing Development Corp.
, 429 U.S. 252, 266 n.14, 50 L. Ed. 2d 450, 465 n.14, 97 S. Ct. 555,  564 n.14 (1977).  In other words, the fact that the State agreed to the impaneling of one African-American juror does not demonstrate, by itself, that the State did not discriminate in using peremptory challenges against Hollins and Holmes.

The occurrence of the trial court's erroneous requirement of a "pattern" of discrimination in the State's exercise of peremptory challenges and its improper emphasis upon the impaneling of an African-American juror are integral elements of my view that this case should be remanded for a 
Batson
 hearing.  See 
Wiley
, 156 Ill. 2d at 474-75.

With this determination in mind, I now address the factors listed in 
People v. Williams
, 173 Ill. 2d 48 (1996), for determining whether a defendant has made a 
prima facie
 showing of purposeful discrimination in the State's use of peremptory challenges.  The first relevant circumstance is whether defendant and the excluded venirepersons are of the same race.  In the instant appeal, defendant, Hollins, and Holmes are African-Americans.  

The next factor deals with whether the evidence in the case establishes a pattern of strikes against African-American venirepersons by the State.  As noted above, in the context of this venire, in which there were so few African-American  venirepersons, a "pattern of strikes" was not relevant.

However, assuming 
arguendo
 that the instant defendant had to prove a pattern of discrimination, the evidence demonstrates that the State peremptorily challenged an inordinate percentage of African-American venirepersons.  As noted above, there were 5 African-American venirepersons in the entire venire of 70 people.  Two of the five were excused on joint motions for cause, leaving three venirepersons that were not challenged for cause.  Two of the three, or 66⅔%, of the remaining African-American venirepersons were peremptorily challenged by the State.  Thus, in the context of this venire, by the time that venireman Holmes was the subject of a peremptory challenge by the State, a "pattern of strikes" had become or was becoming evident.

The next factor is whether there was a disproportionate use of peremptory challenges by the prosecution against African-American venirepersons.  Peremptory challenges were used by the State against 2 of the 5, or 40%, of the African-

American venirepersons.  While the record is not clear exactly how many Caucasians underwent 
voir dire
, I estimate that approximately 55 prospective Caucasian jurors were questioned by the court.  Of that total, the State used 10 peremptory challenges against Caucasian venirepersons.  In other words, the State employed peremptory challenges against less than 20% of the Caucasian venirepersons, a far lower percentage than the percentage of African-American venirepersons excluded by the State's peremptory challenges.

The next factor to be considered is the level of African-American representation in the venire as compared to the jury.  As noted above, one African-American served on the jury.  Thus, the level of African-American representation on the jury was 8.3%.  Further, the 70-person 
venire
 contained 5 African-Americans, or 7.1% of the venirepersons.  As these numbers are comparable, this factor favors the State's side of this issue.

The next factor, the prosecutor's questions and statements during 
voir dire
, is of little relevance here.  The trial court essentially conducted the 
voir dire
.  Further, the State was required to say little during 
voir dire
, even in those situations where defendant objected to the peremptory challenges exercised against Hollins and Holmes.

Another relevant factor is whether the excluded African-American venirepersons were a heterogenous group sharing race as their only common characteristic.  The statements of Hollins and Holmes indicated, 
inter alia
, that they had different vocations and had pursued generally different lifestyles.  Thus, I find that they were essentially heterogenous individuals whose race was their only common characteristic.

A further factor in establishing a 
prima facie
 case is the race of the defendant, the victim, and the witnesses.  As noted in 
Williams
, 173 Ill. 2d at  74, the racial characteristics of a crime are important factors.  The instant record does not disclose the race of the witnesses.  However, it does reveal that defendant is an African-American and the victim was a Caucasian.  Accordingly, this factor may indicate an inference of purposeful discrimination in the exercising of peremptory challenges.

Another factor set out in 
People v. Wiley
, 156 Ill. 2d at 464, 476 (1993), is whether the excluded African-American venire members shared nonracial characteristics with other venire members who were accepted by the prosecution.  A review of the record indicates that Hollins and Holmes did share nonracial characteristics with venirepersons accepted by the State.

Reviewing all the pertinent factors in the instant appeal, in light of our above-cited concerns regarding the trial court's erroneous requirement of a pattern of strikes and misplaced emphasis on the impaneling of an African-

American juror, I conclude that a 
prima facie
 case was established by defendant.  The factors suggesting purposeful discrimination are:  (1) the racial identity between the defendant and the excluded venirepersons; (2) the interracial nature of the crime; (3) the heterogeneous characteristic of the excluded venirepersons, whose primary common characteristic is their race; (4) the disproportionate use of peremptory challenges by the State against African-American venirepersons; (5) an apparent pattern of strikes against African-American venirepersons by the State; and (6) the shared characteristics of the excluded African-American venirepersons with venire members who were accepted by the prosecution.  The only factor supporting the State is the level of African-American representation in the venire as compared to the jury.  The other factor, the State's questions and statements during 
voir dire
 examination and while exercising peremptory challenges, does not favor either side because of the paucity of any such statements or questions.  Accordingly, I conclude that the trial court erred in determining that a 
prima facie
 case of discrimination had not been established.

The State's contention that this case is controlled by 
People v. Williams
, 173 Ill. 2d 48 (1996) is unpersuasive.  
Williams
 is factually distinguishable from the instant appeal.  There, the State used only 2 of its 20 peremptory challenges, excusing 1 African-American venire member and 1 Caucasian venire member.  The overall paucity of the State's peremptory challenges and the lack of two or more peremptory challenges against African-American venirepersons clearly worked against Williams's claim of purposeful discrimination.  Here, as shown above, the peremptory challenges exercised against venire members Holmes and Hollins provide a broader context in which to determine whether a 
prima facie
 case of purposeful discrimination had been made.

People v. Wiley
, 156 Ill. 2d 464 (1993), more closely resembles the appeal at bar.  As noted above, the 
Wiley
 court was concerned, as is this court, with the trial court's understanding of the burden of proof and relevant factors to be considered in situations where violations of 
Batson
 have been alleged.  The 
Wiley
 court also emphasized some factors that are present here.  For example, 
Wiley
 found it highly significant that the excluded prospective jurors were a heterogeneous group with only their race as the common characteristic.  
Wiley
 further stressed that the excluded African-American venirepersons shared nonracial characteristics with other venire members who were impaneled on the jury.  These are factors which, in the instant appeal, also weighed in defendant's favor.

I would find that the trial court's disposition of defendant's 
Batson
 motions were erroneous.  The record demonstrates that a 
prima facie
 case had been established under 
Batson
 in regard to the peremptory challenges exercised against Hollins and Holmes.  The State should have been required to provide reasons for its peremptory challenges exercised against both venire members.