2021 IL App (1st) 182545-U

No. 1-18-2545

Order filed April 9, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 11024 |
| | ) | |
| KEVIN DUGAR, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.

Presiding Justice Mikva concurred with the judgment.
Justice Harris dissented.

**ORDER**

¶ 1    *Held*: We reverse the trial court's denial of postconviction relief on defendant's successive postconviction petition after a third stage hearing, where defendant's newly discovered evidence was of conclusive character necessary to demonstrate actual innocence, and remand for new trial before a different judge.

¶ 2    Following a jury trial, defendant was found guilty of first degree murder of Antwan Taylor, attempted murder of Ronnie Bolden, and aggravated battery with a firearm of Ronnie Bolden. The

trial court sentenced defendant to consecutive prison terms of 48 years for first degree murder, including a 25-year firearm enhancement for personally discharging a firearm which caused death, and six years for attempted murder. Defendant's convictions and sentences were affirmed on appeal. *People v. Dugar*, No. 1-05-1669 (2007) (unpublished order pursuant to Supreme Court Rule 23). On August 6, 2008, defendant filed an initial *pro se* postconviction petition alleging ineffective assistance of counsel which was summarily dismissed by the trial court on October 28, 2008. On March 17, 2015, defendant sought leave to file a successive postconviction petition alleging actual innocence based on an affidavit from his twin brother Karl Smith[1]. The trial court granted defendant leave to file, and the proceedings advanced to a third stage evidentiary hearing at the request of the State. On October 23, 2018, the trial court denied the petition after the evidentiary hearing and this appeal followed.

¶ 3    On appeal, defendant contends that: (1) he is entitled to a new trial where newly discovered evidence, which is conclusive in character, consists of his identical twin brother's postconviction confession to the crime; and (2) a new trial judge should be assigned given the postconviction judge's factual findings that demonstrate he would not believe defendant's critical defense witness. For the following reasons, we grant the petition for postconviction relief and remand back to the circuit court for retrial before a different judge.

¶ 4                          BACKGROUND

¶ 5                      A. Trial Proceedings

¶ 6    Defendant was charged with first degree murder of Taylor, and attempted murder and aggravated battery with a firearm of Bolden, in connection with a shooting that occurred on March

---

[1] Karl uses his mother's maiden name of Smith.

22, 2003. At defendant's jury trial, several witnesses testified to the events that occurred on the night of the offenses.

¶ 7     Monique Boykins testified for the State that on March 22, 2003, she was riding in a truck with Bolden and a man she later learned was Taylor, in the vicinity of 4945 North Sheridan Avenue[2] in Chicago shortly before 8 p.m. After parking the vehicle near Sheridan and Argyle, they began to walk towards a building. Boykins testified that as she reached the curb, someone began shooting. Boykins did not know or could not remember most of the subsequent events of the night. When asked if she saw the person in court that day who shot Taylor, she testified that she saw the person who "they" told her did it and that she did not know who did it.  Boykins recalled that she went to the police station on Belmont and Western on April 28, 2003, where she viewed a lineup. The State then showed Boykins a photograph of defendant, who she picked from the lineup at the police station and asked if that was the person that she told the detectives she saw shoot Taylor and Bolden. In response, Boykins stated that the detectives pointed defendant out to her and told her that the person was named "Twin."

¶ 8     Boykins subsequently identified the statement that she signed and initialed when she went to the police station on April 28, 2003. Although the statement identified defendant as the person who shot the victims, at trial, Boykins testified that he was not the shooter. Boykins explained that she remained at the police station for over 15 hours and tried to tell the State's Attorney and detectives what she knew, but they kept telling her different things. She just wanted to go home so she ultimately just agreed with them.

¶ 9     Finally, the State asked Boykins if she remembered going to the grand jury after speaking with the assistant State's Attorney and detective and signing the statement. While she could not

---

[2] We take judicial notice that the correct address is 4945 North Sheridan Road.

recall what day she went, she did recall going and when asked if she told the truth Boykins responded, "I guess so." She also indicated that she could not remember the specific questions asked or the answers given.

¶ 10    On cross-examination, Boykins testified that while she had not seen Bolden since the shooting, she was threatened by Bolden the day before trial to positively identify defendant. Bolden also previously threatened Boykins in February of 2005.

¶ 11    Bolden testified for the State that on March 22, 2003, shortly before 8 p.m., he was driving his maroon Suburban with Boykins and stopped at Munchies restaurant to pick up Taylor, who he knew from the neighborhood. At the time, Bolden was a member of the Blackstones street gang along with Taylor, although he had previously been a member of the Mafia Insane Vice Lords. The Blackstones gang territory, at the time, consisted of four corners: Argyle and Sheridan; Foster and Sheridan; Foster and Broadway; and Argyle and Broadway.

¶ 12    After Taylor entered the vehicle, they sat and talked for 10 minutes, before leaving to pick up and drop off another person. Bolden then came back around the block and double parked at the corner of Argyle and Sheridan, facing south. There was a store at the corner, and Taylor left the vehicle to go inside to buy something. While sitting at the corner, Bolden noticed defendant, who he knew was a Vice Lord. Defendant was wearing a black jacket, hat and pants. After Taylor went in the store, he could no longer see defendant. Once Taylor returned, they decided to go into a building, so Bolden parked the vehicle across the street near 4945 North Sheridan Road. Bolden, Boykins, and Taylor all left the vehicle, but Bolden forgot something, so he headed back to the car to retrieve it. At this time, Boykins was in the middle of the street. Bolden turned around and saw defendant emerge from behind a van, coming north. Bolden walked towards Boykins and recalled looking down while a car sped past him. As he looked up, he heard Taylor ask "what?" He then

saw defendant. Bolden made an in-court identification of defendant as the person he saw that night. As Bolden saw defendant emerge from a van coming north, he also saw Taylor come from the south of the street. Defendant grabbed and bumped into Taylor, knocking him to the ground. When defendant was approximately one or two feet from Taylor, he shot Taylor in the chest. Bolden rushed to Taylor when defendant pointed the gun at him from approximately 8 to 10 feet away. Bolden then heard defendant say, "Blackstone killer bitch," before shooting him twice in the chest. After being shot, Bolden turned away and ran north on Argyle at an angle. As he ran, Bolden was shot in the back and hand and was subsequently hit by a van. While Bolden laid on his back in the street, he was able to hear defendant's gun jam, which prevented him from shooting Bolden again. Bolden stated he was conscious the entire time and was able to observe his surroundings. Defendant then ran, while talking on a phone, into Buttercup Park which was approximately 15 to 20 feet from where Bolden lay on the street.

¶ 13    Bolden testified that he had known the defendant for approximately 9 or 10 years. He knew that defendant was a member of the Conservative Vice Lords, a different fraction of his former gang. Bolden and defendant lived in the same building[3] and he saw him "every day [*sic*]" from the period of April 17 to May 18, 2002. They would conversate in the halls in passing.

¶ 14    Bolden also testified to knowing defendant's brother Karl for the same amount of time. Bolden said he could differentiate between the two twins because defendant has always been stouter than Karl, indicating that defendant probably weighed 30 to 40 pounds more than Karl. Bolden also recalled that he was sure it was defendant on the night of the shooting because, at "that time he had his little beard and a braid that night. I remember it was in a braid."

---

[3] Defendant and Bolden lived in the same building while incarcerated.

¶ 15    While in the hospital, Bolden was visited by the police on several occasions but did not speak to them.  Initially, Bolden refused to identify anyone involved in the shooting and would only give a physical description; he was going to handle this matter in the streets. However, he testified that he finally decided to tell the police and identified defendant's photo because, "I couldn't hide from him no more; it was staring right there in my face."[4]

¶ 16    On cross-examination, Bolden revealed he did not want to tell the police who shot him because of gang retaliation[5].  He additionally stated that he told police that he knew the shooter was a twin, and that defendant was also known as "C", short for "CVL," which is how all members of the Conservative Vice Lords were identified.[6]  He also told the police that defendant typically hung out near Kedzie and Lawrence.

¶ 17    Thomas J. Ginnelly, a forensic investigator with the Chicago Police Department, testified that on the evening of March 22, 2003, he was assigned to process the scene at 4945 North Sheridan Road, and he arrived shortly after 9 p.m. Ginnelly took photos of the scene and collected, sealed and inventoried cartridge cases and clothing recovered from the scene. The evidence was then sent to the Illinois State Police Crime Laboratory (Crime Lab), for examination. The Crime Lab's report indicated that it received: two Winchester 380 cartridge cases that were recovered from the street at 4945 North Sheridan Road; two 380 auto cartridge cases recovered from 4945 North Sheridan Road; a fired bullet recovered from 4944 North Sheridan Road; and a single medium caliber copper bullet also recovered from 4944 North Sheridan Road. Ginnelly testified that all the bullets could

---

[4] Bolden does not give an exact date of when he identified defendant from the photo array.
[5] Bolden recalled Vice Lord members walking the halls outside of his hospital room.
[6] Defense counsel confirmed through further questioning that Bolden had also identified other Vice Lords members, that he knew personally, to police.

have been fired from the same type of gun, however, he was not a firearms expert and could not determine if they all came from the same exact gun.[7]

¶ 18    Assistant State's Attorney Merle Shearer (ASA Shearer) testified that sometime after 11 a.m. on April 28, 2003, he and Detective Bocconcelli, spoke to Boykins. The conversation lasted for approximately 20 minutes, during which Boykins generally told them about the events of March 22, 2003. At approximately 11:45 a.m., ASA Shearer went over Boykins' statement, this time handwriting the statement with her permission. They each reviewed the statement, signed every page, and initialed any changes. He told Boykins that her signature was "[her]affirmation or * * * agreement that that [*sic*] is true and accurate as *** read *** and we've gone through it now." Additionally, Boykins reviewed and signed the photographs as they reviewed the statement. Exhibit A was a photo Boykins identified as Bolden. Exhibit B was simply referenced as the person in Exhibit B by Boykins; it was a photo of Taylor. The person in exhibit C was identified by Boykins as the shooter.

¶ 19    ASA Shearer published Boykins' April 28, 2003, statement regarding the shooting to the jury. The statement provided that Boykins was picked up by Bolden in his truck, who she identified as the person in exhibit A. They drove to pick up a friend of Bolden's who she identified as the person in exhibit B: Taylor. Other people were picked up and subsequently dropped off. At around 8 p.m., Bolden parked at Argyle and Sheridan. Boykins, Bolden, and Taylor left the truck. She noticed someone behind them as they crossed the street. As they were walking across the street, she saw a man come from the north side of the street, as she was standing in the middle of the street. Bolden and Taylor were on opposite sides of her. Boykins described the man who

---

[7]Ginnelly also testified that a paring knife was found on the street at the scene and submitted for examination, however, he did not know whether it was connected to the shooting.

approached them as being dressed in black pants and a black hoodie that was over his head. The man put his left arm around Taylor's shoulder, and his right hand was at his chest level, she then heard three shots and Taylor fell to the ground. She then saw the man turn to Bolden and she heard another shot as Bolden ran toward his truck. As Bolden was running, the shooter ran towards a park but turned his body and fired two or three more shots at Bolden. Boykins tried to run to get help, but the doors to the building she ran to were locked. When she looked back, she saw Bolden on the ground. Boykins saw a woman who had stopped her car call police. Boykins identified the shooter as the person in exhibit C.

¶ 20    Boykins stated that on April 28, 2003, she went to Area Three police headquarters and viewed a line up. Only one of the twins was included in the lineup; Karl was not present. She identified number four, which was defendant, as the shooter and the person in exhibit C of the April 28, 2003, statement. Boykins stated that after recognizing number four, she saw through the one-way glass that he mouthed the words, "[p]lease, I didn't do it. Don't put me in jail." This testimony was confirmed by Chicago Police detective Steven Bocconcelli (Bocconcelli) who stated that as he started to get the lineup participants ready, defendant talked towards the one-way glass and stated, "[p]lease, I didn't do it. Don't put me in jail." Boykins and his partner were not visible to him on the other side, so he was unsure if they heard and saw who said that, nevertheless he told the defendant not to say it again and to shut up, but defendant continued to say it.   Detective Ronald Yawger (Detective Yawger), Bocconcelli's partner, was present with Boykins and confirmed that he too heard defendant say "[p]lease, I didn't do it. Don't put me in jail."

¶ 21    On re-direct examination, ASA Shearer testified that he remembered Boykins' demeanor as being "scared to death," although she did not indicate that she feared the police or ASA Shearer. On re-cross examination, ASA Shearer testified that he asked Boykins what she was afraid of and

she told him she was afraid of "the subject who had done the shooting and or his associates." He did not include this in Boykin's statement because he did not think it was relevant at the time.

¶ 22    Assistant State's Attorney Daniel Faermark (ASA Faermark) testified that on April 28, 2003, he was assigned to Branch 66 where he presented witnesses and cases to the grand jury. On that day, he met with Detective Bocconcelli and Boykins at approximately 1 p.m. regarding the shooting of Taylor and Bolden. ASA Faermark showed Boykins the three photographs and handwritten statement that she gave earlier before taking her to the grand jury for questioning.

¶ 23    After review and confirmation, ASA Faermark then published the transcript of the grand jury proceedings to the jury at defendant's trial. According to the transcript, Boykins testified in a manner consistent with the handwritten statement that had been given to ASA Shearer. ASA Faermark further testified that Boykins was always cooperative and at no point did Boykins say she wanted to leave.

¶ 24    Nurse Elizabeth Sanchez (Nurse Sanchez) testified that at approximately 8 p.m. on March 22, 2003, she was driving north on Sheridan Road near Argyle on her way to work when she heard a noise. She wasn't sure if "it was a bang or something," so she pulled over to see what was going on. While she was facing north, she saw two men and a woman standing on the right side of the sidewalk. The two men walked in front of her car, they were approximately six to seven feet away. One of the men pointed a gun at the other, she looked down, and then heard shots fired. She did not get a good look of the shooter because she was focused on not hitting them and did not want to get involved. She feared she would be shot as well. Nurse Sanchez testified that it was dark at the time and she could only describe the shooter as a black man who had on a hoodie. In total, she heard at least three gun shots. Although she was looking down, she could tell that the shooter ran

past her car heading south. After seeing the victim laying in the street, she called 911 and attempted to render some aid.

¶ 25    On cross-examination, Nurse Sanchez clarified that the two men on the sidewalk were the same men who walked in front of her car, east to west, leaving the woman on the sidewalk alone. The woman ran, but after the shooting stopped, she stood near the man that was lying on the street.

¶ 26    Brian Wilson, at the time of the offense, was a forensic scientist who specialized in firearms identification with the Illinois State Police. He testified that he examined the four fired cartridge cases and they were all 380 calibers. It was his opinion that all four of the cartridge cases were fired from the same gun. Wilson then identified two fired bullets and a jacket bullet fragment, which he determined were consistent with a 380 caliber firearm. He testified that he could not exclude or include them as being fired from the same firearm.

¶ 27    Detective Bocconcelli testified that he was assigned to the Area Three Detective Division located at Belmont Street and Western Avenue and was assigned to investigate the March 23, 2003, shooting. On April 23, 2003, Bocconcelli interviewed Melvin Hughes, a Conservative Vice Lord member that he was familiar with, regarding the shooting of Taylor and Bolden.[8] Hughes stated he witnessed a shooting on Argyle and Sheridan and that the shooter was named "Twin." Hughes was shown a photo array of five known Vice Lord members from the area of Sheridan Road and Wilson Avenue. While both brothers were known by the same nickname of "Twin", Hughes identified the shooter by his legal name of Kevin Dugar, the defendant, and defendant's brother as Karl Dugar. He had known the brothers for about 10 years and could tell them apart

---

[8] On cross-examination, Bocconcelli testified that he had the narcotics division conduct narcotics buys in the area of Wilson and Sheridan, from Vice Lord members, so that there would be Vice Lords in custody for him to question about the shooting of Taylor and Bolden. On April 24, 2003, he was advised that there were several Vice Lords in custody, including Hughes.

because he knew them and saw them every day. His statements to Bocconcelli were consistent with the statements of other witnesses.

¶ 28 On April 24, 2003, Bocconcelli spoke with Bolden. Bocconcelli set up a photo array for Bolden to view and asked him if he recognized anyone in the photos. Bolden pointed to defendant's picture and he identified him as the person who shot him and Taylor.

¶ 29 Defendant did not present any witnesses and did not testify.

¶ 30 The jury found defendant guilty of first degree murder, attempted murder, and aggravated battery with a firearm. Defendant's posttrial motion for a new trial was denied. The trial court subsequently sentenced defendant to six years for attempted murder, 23 years for first degree murder with a 25-year firearm enhancement; all to be served consecutively. In the interest of justice, the trial court did not enter a sentence for the aggravated battery charge.

¶ 31 Defendant's direct appeal followed.

¶ 32                                    B. Direct Appeal

¶ 33 On direct appeal, defendant alleged that the arguments advanced by the State denied him a fair trial. Specifically, defendant alleged that during closing arguments, the prosecutor misstated evidence, inflamed the jury's passions, shifted the burden of proof, and improperly explained the burden of proof. Next, defendant alleged the cumulative effect of the State's inappropriate remarks required a reversal. However, defendant failed to object and include these arguments in a posttrial motion. Therefore, this court found that the claims were not properly preserved. This court rejected defendant's plain error argument because the evidence was not closely balanced in order to constitute plain error. As for the cumulative effect, this court found that the State's remarks did not create a pervasive pattern of unfair justice. Defendant's sentences and convictions were

affirmed. *People v. Dugar,* No. 1- 05-1669 (2007) (unpublished order pursuant to Supreme Court Rule 23).

¶ 34                                              C. Postconviction Proceedings

¶ 35     On August 6, 2008, defendant filed his initial *pro se* postconviction petition, alleging that: (1) he received ineffective assistance of trial counsel, and (2) the trial court failed to ensure an unbiased jury and allowed the prosecution to present evidence of defendant's gang affiliation. The trial court determined that the issues raised by defendant were frivolous and patently without merit and therefore summarily dismissed the petition on October 28, 2008. On January 5, 2009, defendant filed a notice of appeal regarding the dismissal of his *pro se* post-conviction petition, and his late notice of appeal was denied.

¶ 36     On March 17, 2015, defendant sought leave to file a successive postconviction petition alleging actual innocence in the trial court. Defendant alleged that his twin brother, Karl Smith, confessed to committing the offenses that defendant was convicted of. Karl submitted an affidavit dated July 9, 2014, in which he confessed to the shooting. On June 10, 2015, the trial court advanced the petition to the second stage based on a substantial showing of a violation of defendant's constitutional right.

¶ 37     On December 16, 2015, the State filed a response seeking to advance the proceedings to a third stage evidentiary hearing in order to directly challenge the statements contained in Karl's affidavit and the circumstances that led to its production. The trial court granted the State's request and on September 22, 2016, the evidentiary hearing commenced.

¶ 38     Karl testified on behalf of defendant that he used the names Karl Smith, Karl Dugar, Karl Johnson, and Kevin Dugar. At the time of his testimony, he was incarcerated for two attempted

murders, home invasion, aggravated battery with a firearm, and armed robbery. Those convictions were under the name Karl Smith.

¶ 39    In March of 2003, he was involved with "drug activity" around Lawrence and Kedzie Avenues, as well as Sheridan Road and Wilson Avenue. He was a member of the Conservative Vice Lords and his nickname on the street was "Twin." At the time, his gang was at war with the Black P Stones over drug territory. His brother, the defendant herein, had been in the same gang with him but was not an active member; after he was paroled in 2003, defendant denounced his gang affiliation. According to Karl, defendant was not involved in any gang activity and instead was involved in cutting hair, looking for work, and writing a book. At the time defendant was paroled, defendant was the same weight as Karl and no longer 30 or 40 pounds heavier.   Upon being shown his State of Illinois identification card that was issued on February 3, 2003, Karl stated that the photo accurately showed how he looked at the time; it showed him with a beard that had been braided into three braids.

¶ 40    According to Karl, on March 22, 2003, at about 3 p.m., he threw a gathering for his family and friends, which Defendant attended. At about 7:45 p.m., Karl changed his clothes to all-black attire and left the party to go purchase some marijuana with his friend Gabriel Curiel, who went by the nickname "Outlaw."  They drove Curiel's black Lexus to Sheridan Road and Argyle Street to meet a friend. When they arrived at that location, they parked the vehicle on the north side of Argyle, facing west. Karl crossed to the east side of the street[9] towards his friend's building when a maroon SUV stopped in front of him. Two people jumped out who he identified as Bolden and Taylor[10]; he regularly saw Taylor with Bolden and recognized them to be brothers. Karl did not

---

[9] We presume that he was referring to the east side of Sheridan.  This court takes judicial notice that Argyle travels east and west with parking on the north and south sides.  Sheridan travels north and south with parking on the east and west sides of the street.

[10] Karl identifies the victim Taylor as Twan, we will continue to identify him as Taylor.

socialize with Bolden but knew him from the neighborhood. He then saw Boykins, who he was also familiar with, exit the truck.

¶ 41    Karl testified that when the parties jumped out of their vehicle, it appeared that Bolden was about to pull a gun on him. At that point, he pulled out his 380-automatic and fired six or seven shots until the gun jammed. He then retrieved a revolver and fired an additional three shots. Karl was standing on the east side of Sheridan Road when he began shooting. After he switched guns, he ran back to the car. He saw Taylor fall to the ground, saw Bolden continue to "charge at him," and he continued to shoot at Bolden. He never saw a gun on the victims but saw a black or silver "something" in Bolden's waistband. He got back in the car with Curiel and asked him to drive to the liquor store without ever discussing the shooting. After going to the liquor store, he returned to his party and never told anyone about the shooting.

¶ 42    Shortly thereafter, Karl began receiving calls from the police requesting that he come into the station. They told him that if he came in, they would let his brother go. Prior to defendant being in custody, the police stopped Karl and asked where Karl was, he then assumed defendant's identity and said he didn't know. While defendant was in custody for the shooting, he asked Karl if he was the one who committed the crime. At that time, Karl denied any involvement. He stated that he thought the charges against his brother would not stick since his brother did not commit the crime.  Karl further testified that he did not come forward after defendant was convicted because he felt it was not his job and he did not have the strength to willingly turn himself in. However, he testified that he began to abuse alcohol and drugs because of the stress over what had happened to his brother, the defendant.

¶ 43    In 2008, Karl was subsequently convicted of a separate crime and was sentenced to *de facto* life of 99 years, which was affirmed by this court in June 2013. While incarcerated, Karl indicated

that he sought help and got counseling from the prison chaplain. He was on a spiritual journey that required him to clear his conscience with respect to his brother's wrongful incarceration. As such, in 2013, Karl decided to confess by writing a letter to defendant detailing his actions. Karl testified that he did not receive a response from defendant, so he wrote a second letter two to three weeks later, on October 24, 2013, to which Defendant responded. Subsequent thereto, Karl was interviewed by defendant's attorney and an investigator in July 2014 and signed an affidavit. In August of 2015, representatives of the State's Attorney Office recorded Karl's statement.

¶ 44    On October 24, 2016, a video deposition of Doctor Brian Cutler (Dr. Cutler), an expert in eyewitness identification, was presented in court. He testified on behalf of defendant that many factors can affect the memory of a witness, making witness identification unreliable. Those factors were: exposure time, extreme stress, weapon focus, and poor lighting conditions. Further, Doctor Cutler found that when positive identifications were made it was often a result of deduction. To prevent an identification from being made by deduction, statements inferring the suspect should not be made. Additionally, Doctor Cutler recommended the practice of a blind lineup, where the administrator did not know the suspect, to prevent any inadvertent persuasion.

¶ 45    On January 18, 2017, (former) detective Bocconcelli testified on behalf of the State regarding three different conversations he had with defendant. On April 28, 2003, upon learning that defendant was in custody, Bocconcelli spoke with defendant regarding where he was at the time of the shooting.[11]    Initially, defendant stated that he and his girlfriend were at a party at his mother's home at the time of the shooting, which was verified by defendant's mother and girlfriend

---

[11] He admitted both he and his brother were Vice Lords; he was a west side Vice Lord, while his brother was a north side Vice Lord.

Chanel Allen[12]. However, during a second conversation with defendant, defendant stated that he lied about being home because he did not want to violate his parole; he was actually in Pennsylvania. Bocconcelli verified that tickets were purchased to Pennsylvania from Amtrak receipts, but had no way of knowing if defendant in fact boarded the train. Defendant's mother also admitted lying out of fear of defendant being in violation of his parole.

¶ 46    Bocconcelli testified that Karl never participated in a lineup despite efforts to have him come in for it. In one conversation he had with Karl over the phone, he said he knew nothing about the shooting and was at his girlfriend's house the night of the shooting.  Consequently, Karl was not included in any photo array or line up.

¶ 47    Gabriel Curiel testified that he knew defendant from high school. He socialized with defendant outside of school and was familiar with his family. As such, he was able to tell the twins apart. He knew defendant to be darker, heavier, and more serious than Karl. Karl was smaller, had a different shade of brown in his skin, and was more playful and goofier. In March of 2003, he socialized with the twins but never attended a party at defendant's home on March 22, 2003. Karl informed Curiel that defendant was incarcerated for the shootings and that defendant sent Karl a letter asking everyone to say they were at a party on March 22, 2003.

¶ 48    However, Curiel testified that on March 22, 2003, he was not in attendance at a party at defendant's house. Curiel was not with Karl and was not within the vicinity of Sheridan and Argyle on that date. On cross-examination, Curiel confirmed that he is known as "Outlaw" and that he owned a black Lexus in March of 2003. He was friends with Karl up until January 18, 2008. On that date, Karl and an accomplice forced themselves into his home while armed with guns. Karl

---

[12] While in custody, defendant said that he wanted to call his lawyer, but instead called his girlfriend, Chanel Allen. Defendant indicated that she would corroborate his story that they were at his mother's house on the night of the shooting, which she did.

tackled and threatened to kill him as he stabbed him. The accomplice kicked him in the face causing Curiel to lose consciousness. He woke up to find that his six-year-old son had been shot in the head, and his safe containing drugs and money had been emptied. Curiel was stabbed multiple times and shot at least twice. He testified that Karl belongs in prison for what he did to him and his family and that he hated him. On re-direct examination, Curiel testified that he denied being with Karl on March 22, 2003, because it was the truth and not because he hated him.

¶ 49    Defendant testified on his own behalf that he did not commit the crimes that he was convicted of. He and his brother were both Conservative Vice Lords who sold drugs. He left the gang in 2002 because he grew tired of the lifestyle. He had not engaged in drug dealing since 2000 and had not engaged in any gang activity since March of 2002. On November 6, 2002, while still in prison, he applied to parole in Pennsylvania so he could start a new life with his longtime girlfriend. He also predicted that if he stayed in Chicago it would lead to his downfall; nevertheless, his application was denied. Upon his release on January 31, 2003, he was approved to live with his parents in Chicago, Illinois.

¶ 50    Defendant admitted moving to Pennsylvania on February 13, 2003, despite being on parole and not having approval to leave the state. He thought he would have an opportunity to start a new life and was afraid for his life in Chicago, since Karl continued to be involved with the gang life. While on parole, defendant reportedly did not carry a gun, did not go around gang "hot spots," and did not sell drugs. For income, he cut hair and danced.

¶ 51    On March 16, 2003, defendant returned to Chicago for a meeting with his parole officer. He never went back to Pennsylvania. He stated that he was still just trying to work and not engage in any gang activity.

¶ 52    On March 22, 2003, he went to a couple of parties in the evening and a club later that night. The parties were located at his approved parole address, one was on a lower floor and the other was on an upper floor. Defendant attested that the party consisted of family and friends including Karl and Curiel.  Defendant saw Karl leave with Curiel between 7 and 7:30 p.m., wearing black pants and a hoodie. Approximately one hour later, Karl returned without Curiel. The brothers then went to the club around 10:00 p.m., which was the first time he left the property since 4 p.m. He specifically stated that he did not go in vicinity of Argyle and Sheridan Road.

¶ 53    Defendant was arrested on April 27, 2003, and first learned of the date of the shooting when he entered Cook County jail.  While there, Karl visited defendant about 24 times. On one of those visits, defendant asked Karl if he committed the crimes and Karl denied doing so.  So, to further his case, defendant sought to have everyone that attended the party testify about it; he never asked anyone to lie.

¶ 54    Defendant testified that he knew Hughes from his time as a Conservative Vice Lord. Hughes would call him "Twin," but he only met him about seven times in his life. He last saw him in 1998 and did not interact much because they were from different areas. Defendant testified that he did not know Bolden or Taylor.

¶ 55    Defendant recalled receiving a letter from Karl, confessing to the crimes, in the beginning of October 2013. He did not respond because he was shocked and "messed up" in the head from it. The second letter Karl wrote was dated October 24, 2013, where he continued to confess, hurting him even further. This time defendant did respond and "cursed him out." He also asked Karl to contact organizations on his behalf to help him get released. He testified that he never asked Karl to falsely claim he committed these crimes.

¶ 56    Speaking directly to the court, defendant noted that he rejected a plea deal for 11 years from his trial attorney. He did this because he was innocent, and he thought justice would prevail. He further stated that at sentencing he told the court he was innocent, and he was still an innocent man.

¶ 57    On cross-examination, the State had defendant address several inconsistencies in his earlier testimony: 1) Defendant admitted that he told the police of only one party and not two; 2) After moving to Pennsylvania, he avoided receiving a parole violation because his brother helped him by calling his parole officer and pretending to be him; 3) He could not recall if he called his girlfriend as opposed to his attorney while in the police station.

¶ 58    On October 23, 2018, the trial court orally denied defendant's successive postconviction petition. The court indicated that its decision was based on the witnesses. Defendant and his mother had changed their story; Curiel was asked to say a party happened but instead testified that he was not with the family at all that day; and Karl's version of events for the shooting directly contradict the independent testimony of Nurse Sanchez. The court also took into consideration the testimony of the expert witness, which gave the court insight about the witness identification process. The court weighed defendant's testimony that he and his brother were always using each other to get out of trouble:  meaning, they were always using their twin status to escape responsibility for their acts. As such, the court found that the brothers had a pattern of misdirection and deceit.  Further, the court opined that this confession was only made after Karl's direct appeal was affirmed for his 99-year sentence; at that point, Karl had nothing to lose.

¶ 59    Further, the trial court found it unbelievable that anyone would let their innocent twin sit in the penitentiary for 10 years for a crime that they themselves committed. The trial court concluded that Karl was not credible and gave no weight to his testimony. Looking at all the

evidence and taking into consideration the issues of credibility, the court found that it was more likely than not that a reasonable jury would have still found defendant guilty beyond a reasonable doubt, even considering the new evidence. Thus, the trial court denied the relief sought in defendant's postconviction petition and defendant now appeals.

¶ 60                                                    ANALYSIS

¶ 61     On appeal, defendant contends that he is entitled to a new trial when his twin brother recently confessed to the crime, the shooting happened on a dark street by a hooded offender, and he was convicted based on identification testimony by eyewitnesses who were under duress at the time of the crime. He further contends that, on remand, reassignment to a new trial judge is necessary given the postconviction judge's findings that demonstrate he would not believe defendant's critical defense witness.

¶ 62                                          A. Standard of Review

¶ 63     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2014)) provides a statutory remedy for defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a direct appeal but rather a collateral attack on a prior final judgement. *Id.* "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22.

¶ 64     The Act contemplates the filing of only one petition without leave of court. *People v. Sanders*, 2016 IL 118123, ¶ 24. Any claim not presented in an original or amended petition is waived. *Id.* There are two exceptions for which the bar on successive petitions can be relaxed. *Id.* The first exception is when the petitioner satisfies the cause and prejudice test. 725 ILCS 5/122–

1(f) (West 2014). The second exception is known as the fundamental miscarriage of justice exception. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). That exception requires the petitioner to demonstrate actual innocence. *Id*.

¶ 65    The Act provides a three-stage process for adjudicating petitions. *People v. Cotto*, 2016 IL 119006, ¶ 26. At the first stage, the trial court determines whether the petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014). If the petition is not dismissed at first-stage proceedings, it advances to the second stage. *Cotto*, 2016 IL 119006, ¶ 26. At the second stage, the trial court must determine whether the petition and any accompanying documentation makes a "substantial showing of a constitutional violation." *People v. Domagala*, 2013 IL 113688, ¶ 33.   At a third stage evidentiary hearing the trial court serves as the fact-finder; the court's function is to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. *Id*. at ¶ 34. At a postconviction hearing, a defendant bears the burden of proof, to show a denial of a constitutional right by the preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 66    After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. "Manifest error" is defined as "error which is, clearly evident, plain, and indisputable." *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 67                                  B. Actual Innocence

¶ 68    Defendant contends that he has demonstrated a cognizable claim of actual innocence and should receive a new trial based on the newly discovered evidence that his identical twin brother confessed to the crimes for which defendant was convicted. Further, the eyewitness testimony was

not reliable where the shooting occurred at night, the offender wore a hoodie, and the eyewitnesses were "in shock" and or duress.

¶ 69    Evidence of actual innocence must be: (1) newly discovered, (2) material and not merely cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Edwards*, 2016 IL 111711, ¶ 32. Newly discovered evidence is evidence discovered after trial, that could not have been discovered earlier due to due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Material evidence is evidence that is relevant and probative of defendant's innocence. *Id*. Non-cumulative evidence is evidence that adds to what the jury has already heard. *Id*. Finally, evidence is of a conclusive character when it would probably lead to a different result along with all the other evidence at trial. *Id*.

¶ 70    Defendant attempted to satisfy the requirements of an actual innocence claim by alleging (1) that Karl's confession was newly discovered because it was not made available to him until after his trial when Karl first admitted his guilt in the 2013 letter to defendant; (2) that the confession was material, in that Karl confessed to being the lone shooter of a crime that defendant was convicted of, and noncumulative because it was not evidence that the jury had previously heard; and, (3) that the confession is so conclusive that it places the trial evidence in such a different light that it will result in a different outcome at retrial.

¶ 71    In the case at bar, the trial court denied the postconviction petition based primarily on the element of conclusive character and gave little attention to whether the evidence was newly discovered, material, and noncumulative. We will nonetheless address all factors.

¶ 72    The State argues that Karl's confession is not newly discovered because the theory that his twin was the shooter was presented at trial. Newly discovered evidence is evidence discovered after trial, that could not have been discovered earlier due to due diligence. *Coleman*, 2013 IL

113307, ¶ 96. The State however mistakenly applied the test to whether the "theory" was newly discovered, as opposed to whether the evidence was newly discovered. Every plea of not guilty puts forth a theory that someone else must have committed the crime. Following the State's logic, every posttrial confession would be barred as not newly discovered. We decide cases on actual evidence, not theory. Here, the newly discovered evidence was the actual confession that supported the theory or idea that his twin could have committed the crime, not the mere idea or theory alone. Defendant asked Karl if he committed the crime, but Karl denied it at that time. This evidence was unavailable to everyone at trial including the defendant, until ten years later when Karl wrote the letter to defendant. Although, at trial, the theory was set out, that this could possibly be a case of mistaken identity given that defendant was a twin, there was no evidence to substantiate that claim. Further, the State does not allege a lack of due diligence on behalf of Defendant. Thus, we find that this evidence is newly discovered.

¶ 73 Neither, the State nor the trial court dispute that the confession was relevant and probative to defendant's claim of innocence. Similarly, they do not allege that the confession was noncumulative. The trier of fact had not previously heard evidence of a confession; thus, this confession would do more than just add to or bolster the evidence already presented at trial: the confession would change the defense's case entirely. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 74 At the evidentiary hearing on defendant's successive postconviction petition, the trial court found that the evidence presented by defendant was not conclusive enough to create a probability that the outcome of defendant's trial would have been different if such evidence had been presented at the trial. Specifically, the trial court examined the witnesses that testified at the evidentiary hearing (namely Karl, Dr. Cutler, Detective Bocconcelli, Curiel, and defendant) and compared their testimony to the evidence presented at trial. With respect to the evidentiary hearing, the trial

court determined that the elicited testimony lacked credibility to support Karl's confession. In examining Karl's testimony and confession, the trial court specifically determined that Karl was not credible.

¶ 75     At a third stage evidentiary hearing, a court makes credibility determinations and weighs any testimony presented against other evidence. *Domagala*, 2013 IL 113688, ¶ 34. In making credibility determinations and weighing the evidence presented at the hearing, the trial court made the following findings with respect to the credibility of Karl's confession: Karl admitted evading questioning in this case by pretending to be defendant; both brothers admitted to adopting one another's identities throughout their lives; Curiel, who was supposed to be Karl's getaway driver on the night of the shooting, denied being with anyone from defendant's family on that date; and, Karl's description of the events on the night of the shooting were in direct conflict with the series of events described at trial by Nurse Sanchez. The court further considered the fact that defendant consistently lied about his whereabouts on the day of the shooting with the help of his mother and girlfriend. Based on the aforementioned considerations, the trial court found that when added to the evidence presented at the original trial, the confession was not of such conclusive character that it would probably lead to a different result.

¶ 76     Upon conclusion of a third stage evidentiary hearing, we review the trial court's denial of a postconviction relief petition for manifest error. *Coleman,* 183 Ill. 2d at 390.

¶ 77     At defendant's third stage evidentiary hearing, the trial court was required to determine "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 48. This analysis necessarily involves viewing the old and new evidence together,

and—as our supreme court has made abundantly clear—any new evidence "need not be entirely dispositive to be likely to alter the result on retrial." *Id.*

¶ 78    The old evidence, presented at trial in 2005, included a diminutive amount of physical evidence. Defendant presented no witnesses, and he did not testify on his own behalf.  The State presented three eyewitnesses, but only one of them —Bolden—testified that Defendant was the shooter. The other two witnesses testified that they could not identify the shooter: Sanchez could not identify the shooter because it was dark and he wore a hoodie, and Boykins recanted her identification of the shooter.  Bolden explained that he could identify the shooter because he "kn[e]w of" defendant from "see[ing] him in the neighborhood" prior to the shooting. He also testified that he lived in the same building as defendant for a month in 2002, when he and defendant were both in prison. Bolden knew him as "Twin," and only learned defendant's name after selecting his photo at the police station approximately four or five weeks after the shooting. Despite not knowing their real names, Bolden testified that he could tell the twins apart because defendant had a bearded braid and was 30 or 40 pounds heavier than Karl. Bolden testified that he and Taylor, the other victim, were members of the Blackstone street gang and the shooter yelled "Blackstone killer bitch" before shooting Taylor. Bolden testified that he saw members of the Conservative Vice Lords, a rival gang, in the area prior to the shooting and that defendant was a member of that gang. Dr. Cutler testified that exposure to time, stress, poor light, and weapon focus can make eyewitness testimony unreliable.  Nonetheless, here, one witness identification from a member of a rival gang, coupled with other circumstantial evidence but no forensic evidence that implicates defendant, was sufficient to convict defendant. However, as in *People v. Coleman*, we find it to be "far from overwhelming." *Coleman*, 2013 IL 113307, ¶ 109.

¶ 79    The new evidence adds to the picture presented at trial. Karl, Defendant's identical twin, gave a full and complete confession to the crime in which he testified that Defendant was totally innocent. Karl had first made this confession in letters he sent to his brother in 2013 after counseling from a prison chaplain. He also gave an extensive interview to the State's Attorney's office in 2015, detailing his own guilt and his brother's innocence. Karl had the braided beard that Bolden claimed was the reason that he could identify the shooter, and Karl was a member of the Vice Lords. The exhibits entered at the postconviction hearing included arrest profiles of the two brothers from 2003 that stated Karl was only ten pounds heavier than defendant at that time. Karl also testified that after Defendant was paroled in 2003, they were the same weight. There was certainly a strong probability that a jury, hearing all of this, "would reach a different result after considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 123849, ¶ 48.

¶ 80    It is the role of the trial court to make credibility determinations. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Here, however, the trial court's determination that a jury should never be allowed to consider Karl's confession, together with other evidence, to decide whether defendant was guilty beyond a reasonable doubt was "manifestly erroneous." *People v. English*, 2013 IL 112890, ¶ 23. We find that the decision was manifestly erroneous not necessarily because we believe Karl, but because it is indisputably evident that the confession could probably change the outcome; however, that is left for the trier of fact to decide.

¶ 81    The ruling by the trial court in this case, runs contrary to the clear precedent set by our supreme court. The trial court's oral ruling ignored our supreme court's mandate that "the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Coleman*, 2013 IL 113307, ¶ 97. A review of the trial court's relatively brief oral ruling demonstrates that the court

was swayed by its own view that defendant was guilty, and that Karl was simply trying to get his brother out of jail. It never engaged in the analysis that supreme court precedent requires.

¶ 82    The trial court began its ruling by focusing on the fact that defendant first said that he was at his mother's house when the shooting occurred and then "his story changed" and he said he was in Pennsylvania. Defendant made these statements at the police station over a month after the shooting. As defendant made clear in his reply brief:

> "It is understandable that Defendant did not initially know whether he was at home or in Pennsylvania on the day of the murder, given that he had no idea when the murder actually took place and had very recently been in Pennsylvania. After Defendant learned the details of the shooting, he has consistently maintained that on the evening of March 22, 2003, he was at home in Chicago."

What has not changed however, is that defendant has maintained his innocence since the date of his arrest; even rejecting an 11 year plea deal.

¶ 83    The trial court then focused on Curiel, who Karl had testified was with him at the time of the shooting. It is no surprise that Curiel denied this at the hearing as it would likely make him accountable for the murder and attempt murder. Further, Karl was imprisoned for robbing and shooting Curiel and his son; it is no wonder why Curiel would not testify to assist Karl and defendant. Nonetheless, the trial court found this denial to be "another indication" that Karl was not being truthful.

¶ 84    The trial court concluded by dismissing Karl's testimony as "completely uncredible," saying "[n]o weight whatsoever should be given to his testimony." The trial court spent much of its ruling justifying its complete disregard of Karl's confession. The court expressed disbelief that a twin could "leave [his] own identical twin, who [he] knew was innocent, in the penitentiary for

*** a crime that he didn't [commit]." However, we find no evidence in the record or testimony about their relationship to support such a far reaching generalization.

¶ 85    The trial court also relied on what it characterized as testimony that, "Defendant Dugar told Detective Bocconcelli that he and Karl were always using each other to get out of trouble, which this means that they're always using this to escape responsibility for their acts," and emphasized that this amounted to a "pattern of misdirection and deceit." Although there was some evidence that the brothers continued to pass for one another, Detective Bocconcelli testified that defendant said he and his brother were "constantly being stopped for each other" and mistaken for one another.   The basis for defendant's postconviction petition is exactly that—he has been mistaken for Karl and has been given a *de facto* life sentence because of that mistake.

¶ 86    The trial court also determined that Karl was not credible because he came forward only after his conviction was affirmed on appeal—when he had nothing to lose. To the contrary, Karl testified that he filed a postconviction petition and was still fighting his conviction. Thus, he most certainly had something to lose by confessing to a murder and an attempt murder under oath.

¶ 87    Most disturbing is the fact that the trial court's only analysis of the trial evidence was to say that Karl's "explanation and description of the shooting is contradicted by the evidence at trial and also by [Ms.] Sanchez who was an independent witness." The court never acknowledged that Karl's testimony aligned significantly with the testimony of the trial witnesses: he wore all-black clothing, he rode in a black Lexus, the crime was committed near Argyle and Sheridan, he shot Taylor and then Bolden, he shot a .380 pistol, the pistol jammed, and the victims drove a maroon SUV.  He also had a braided beard, which was the key characteristic that Bolden relied on to identify the shooter.

¶ 88    Not surprisingly, there were some inconsistencies. Karl did testify that he ran north after the shooting, while Ms. Sanchez and Bolden testified that he ran south. Karl also testified that he used two guns while Bolden testified as to only one gun.  However, a confession never needs to perfectly align with other testimony to result in a conviction. See *People v. Edwards*, 301 Ill. App. 3d 966, 984 (1998) ("Every detail of the confession need not correspond to the independent evidence in every particular."). And more relevant, at the third stage of a postconviction proceeding new evidence need not be dispositive on an issue to make it likely that the jury would reach a different conclusion on retrial. *Robinson*, 2020 IL 123849, ¶ 48.

¶ 89    There is evidence in the record that points to defendant's innocence, including his request to the parole board in November of 2002—four months before this crime occurred—to move to Pennsylvania so he could "live a peaceful life" away from the gangs and crime that he had been part of in Chicago, his consistent claim that he is innocent—including his refusal to accept a plea deal for an 11-year sentence—and the lack of violence in his criminal history, except for a conviction for battery which resulted in a 30-day sentence. Of course, there is also evidence that suggests guilt. The question for the trial court at the third stage was not whether defendant was innocent; it was whether "the facts and surrounding circumstances *** should be scrutinized more closely to determine the guilt or innocence of [the defendant]" on retrial. *People v. Molstad*, 101 Ill. 2d 128, 136 (1984). The postconviction evidence makes clear that, of the two identical twins, Karl is the one who made a full confession to these crimes, committed other violent crimes, was an active gang member at the time of the shooting, and had braids in his beard. This evidence is sufficient to probably change the result on retrial and it most certainly undermines the confidence that this court has in defendant's conviction.

¶ 90                                CONCLUSION

¶ 91    The judgment of the circuit court of Cook County is hereby reversed and the case is remanded for a new trial whereby the trier of fact can consider the confession together with other relevant evidence.

¶ 92    Defendant also requests that the new trial is assigned to a different circuit court judge. While we are not able to opine as to whether the circuit court judge has actual bias against the defendant, we believe that the appearance of bias is sufficient in cases such as this to warrant assignment to a different judge.    The circuit court judge here found Karl to be "completely uncredible," among other things, which may give the appearance of bias at the new trial. Therefore, the case shall be transferred to another judge for retrial.

¶ 93    Reversed and remanded with directions.

¶ 94    JUSTICE HARRIS, dissenting:

¶ 95    When the trial court conducts an evidentiary hearing on a claim of actual innocence, it first determines whether the claim presents new, material, and noncumulative evidence, and if so then whether the new, material, and noncumulative evidence places the trial evidence in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *People v. Coleman*, 2013 IL 113307, ¶ 97.

¶ 96    As a threshold matter, I do not find Karl's confession to be new. Defendant claimed that the confession was newly discovered because it was not made available to him until Karl first admitted his guilt in his 2013 letter. Karl averred and testified that he did not tell defendant of his involvement until his 2013 letter, denied to defendant before trial that he committed the offenses, and never discussed defendant's case with his trial counsel. Defendant averred and testified that he asked Karl after his arrest if Karl had committed the offenses but Karl denied it.

¶ 97     To be new, however, evidence must not only be not discovered until after trial but not be discoverable earlier with due diligence. *Id*. ¶ 96. Before and during trial, there was evidence that defendant was identified as the shooter, and defendant knew that he had a twin brother involved in a gang as a mistaken identity theory was argued at trial. Under such circumstances and in light of defendant's profession of actual innocence, I believe diligence would require defendant to not merely wait for Karl to offer his account of events but reach out to Karl to obtain his account. Stated another way, while Karl averred that he confessed once his conscience had been awakened in 2013, a diligent defendant would have tried to appeal to Karl's conscience earlier. However, there was no evidence he attempted to do so beyond asking Karl once if he was the shooter and Karl denying it. I do not believe that accepting Karl's single denial without more, when defendant had good reason to believe someone who looked like him committed the offenses, is due diligence.

¶ 98     The majority notes that Karl testified in the evidentiary hearing to having a braided beard in 2003, which is relevant in light of Bolden's trial testimony that he knew the shooter was defendant and not Karl in part because defendant had a braided beard. Karl's testimony was supported by his identification card, issued in February 2003 while the instant offenses occurred in March 2003, depicting Karl with a braided beard. However, even without Karl's confession or cooperation, diligent trial counsel could have found and presented evidence – Karl's identification-card photograph or a similar photograph of Karl from around the same time – that Karl had a braided beard and used it to try to impeach Bolden's identification. As this evidence was discoverable before trial with due diligence, I would find it to not be new evidence.

¶ 99     Moreover, I do not consider the trial court's conclusion that Karl's confession was not conclusive to be manifestly erroneous. Evidence is conclusive if it would probably lead to a different result when considered alongside the trial evidence; that is, it places the trial evidence in

a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Id*. ¶¶ 96, 97. While the trial court should not redecide the defendant's guilt in deciding whether to grant relief, an evidentiary hearing on an actual innocence claim "is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id*. ¶ 97. This court thus reviews the trial court's decision to deny relief following an evidentiary hearing for manifest error, reversing that decision only when error in the decision is clearly evident, plain, and indisputable or the opposite conclusion to that decision is clearly evident. *Id*. ¶ 98.

¶ 100   Karl is defendant's identical twin brother and is serving a *de facto* life sentence for unrelated offenses, with this court having affirmed that conviction on direct appeal. While there was evidence that Karl is challenging that conviction and sentence collaterally, it is reasonable to conclude that Karl's sentence leaves him with little to lose by admitting to additional offenses to spare his twin brother. The opposite of the trial court's decision – that Karl's confession places the trial evidence in a different light and undercuts confidence in defendant's conviction – is not clearly evident, plain, or indisputable.

¶ 101   While the majority finds that the evidence of defendant's guilt was sufficient but not overwhelming, this court on direct appeal found the evidence was not closely balanced. I agree with the trial court in denying defendant's successive petition that adding Karl's confession to the existing trial evidence would not probably lead to a different result. A trier of fact at a hypothetical new trial would not have to find that the confession of defendant's twin brother, offered years after defendant's arrest and trial, sufficiently weighs against the existing evidence of defendant's guilt and the other evidence that would come in with Karl's confession.

¶ 102   The jury in defendant's trial was already well-aware of identical twin brother Karl's existence and gang membership. A new trier of fact would hear Karl's confession but also hear in

impeachment what the trial court heard in denying defendant's successive petition: that while defendant was arrested in 2003, convicted in 2005, and his conviction was affirmed in 2007, Karl's unrelated conviction and lengthy prison sentence were affirmed in 2013 and Karl only then offered a confession to his brother in the form of a letter a few months later. While Karl attributed his belated confession to the awakening of his conscience after spiritual counseling, the trial court was not, and a new trier of fact would not be, obliged to credit that testimony.

¶ 103   According to Karl's hearing testimony, Bolden and Taylor jumped out of their vehicle and rushed towards Karl, and Bolden looked like he was going to draw a weapon, so Karl fired a .380 automatic pistol and then a .32 caliber revolver at them as he retreated towards the vehicle in which he arrived.  However, Boykins testified at trial that she, Bolden, and Taylor were walking from a vehicle across the street towards a building when someone ran towards them and shot Taylor, and Boykins heard more shots as she fled. Boykins's pretrial account in her statement and grand jury testimony was even more contradictory of Karl's confession: that as Boykins, Bolden, and Taylor crossed the street, defendant approached them, grabbed Taylor and fired into him, and fired at the fleeing Bolden. These are not merely "some inconsistencies" between the trial evidence and Karl's confession but a fundamental contradiction between the trial evidence from Boykins (and Bolden) that defendant attacked without provocation and Karl's account that Bolden and Taylor were the aggressors. Also, while the firearm evidence at trial was unclear as to whether one gun or two was fired, only .380 bullets and cartridges were recovered, which is inconsistent with Karl's account that he fired a .32 revolver as well as a .380 automatic.

¶ 104   A new trier of fact would also hear in impeachment of Karl's confession, which in part implicated Curiel, Curiel's denial that he was involved in the shooting or with either defendant or Karl on the night of the shooting. While the majority notes credibility issues with Curiel's

testimony, his account and his credibility would be more disputable evidence before a new trier of fact. A new trier of fact would hear evidence that defendant and Karl were mistaken for each other, which arguably supports defendant's case, but also that they routinely and intentionally impersonated each other, which casts doubt on it; again, more disputable evidence.

¶ 105   With Karl testifying in a hypothetical new trial that he committed the instant offenses and defendant was not present, a trier of fact could also hear evidence that the trial jury did not because defendant dropped an alibi defense before trial: evidence that defendant gave police conflicting and erroneous alibis. The majority gives little impeaching weight to defendant's admittedly erroneous alibi that he was in Pennsylvania, reciting favorably his argument that he "did not initially know whether he was at home or in Pennsylvania on the day of the murder, given that he had no idea when the murder actually took place and had very recently been in Pennsylvania." However, Bocconcelli's hearing testimony was that defendant's *first* alibi was that he was home on the night of the shooting – his Illinois home, as his mother supported this alibi – and *then* he gave the erroneous Pennsylvania alibi that his mother also supported. Unless defendant was professing to be home every night for an indefinite period, it is an eminently reasonable inference that he was asked where he was on a *particular* night and thus knew the date in question when he later gave the Pennsylvania alibi. To the extent defendant claims otherwise, this is another instance of disputable evidence.

¶ 106   In sum, while I recognize that the majority's confidence in defendant's conviction is undermined by Karl's confession, I find the trial court's decision that Karl's evidence is not conclusive to not be manifestly erroneous, as the opposite of that decision is not clearly evident, plain, or indisputable when the original and new evidence are considered together. I would therefore affirm the trial court's denial of defendant's successive petition.